# HENRY ERICSSON CO. v. UNITED STATES.

## No. 44614.

Court of Claims.

Oct. 1, 1945.

This case having been heard by the Court of Claims, the court, upon the evidence and the report of a commissioner, makes the following special findings of fact:

1. Plaintiff is and at all times hereinafter mentioned was a corporation duly organized and existing under the laws of the State of Illinois, with its principal office and place of business at Chicago, Illinois, and engaged in the business of building construction.

2. Pursuant to advertisement and bid, plaintiff and the defendant entered into a contract September 3, 1936, by which, in consideration of $2,097,600 to be paid by the defendant, plaintiff promised to furnish all labor and materials and to perform all work required for the construction of the superstructures in the north sector of the Julia C. Lathrop Homes in Chicago, Illinois (Federal Emergency Administration of Public Works, Housing Division, Project No. H-1406), in accordance with plans and specifications submitted to bidders and made a part of the contract, which contract, plans, and specifications are made a part hereof by reference. The south sector, of comparable size, was to be built at the same time by other contractors. For convenient reference plaintiff's contract work will be called the Lathrop job.

The contract provided that work should be commenced upon receipt by the contractor of notice to proceed and should be completed within 365 calendar days from the date of receipt by the contractor of that notice. Notice to proceed was received by plaintiff September 23, 1936. During the progress of the work change orders altered the contract requirements and extended the time for completion 74 days. The job was completed within the extended time required and plaintiff has been paid the full price specified in the contract, as adjusted by the change orders.

3. The contract provided for the construction of 17 buildings, which were to contain in the aggregate 484 apartments, with a total of 1,690 rooms. Eleven buildings were to be 3-story; five were to be 2-story, and the administration building was to be 1-story. The exterior wall foundations had already been installed, but plaintiff was to install interior column foundations. The reinforced concrete floor slabs and roof slabs were to rest directly on the walls, which were to be built of one course of brick, backed up by tile. The contract work also included plumbing, electrical wiring, electrical equipment, and heating equipment, including radiators and pipes, but not the construction or equipment of a heating plant. A central plant for supplying steam for heat for both sectors was to be erected on the south sector by contractors other than plaintiff. The contract work also included certain specified grading and planting, laying of sidewalks and pavement.

4. Plaintiff's plan of operation contemplated (1) the necessary sequence of classes of work in the construction of the individual buildings and (2) the usual, customary and proper coordination of work on the buildings as a whole so that construction of a number of buildings would go forward concurrently, separate types of work being rotated among the buildings in such manner as to provide for continuous progress in each class of work and, at the same time, to assure the performance of each class of work in a single building in proper sequence with other work on that building.

5. The plan of operation for the individual buildings was dictated largely by the nature of the structures. Except for interior supports, each floor slab supported the wall above it and each wall supported the concrete slab for the next floor, the walls of the highest floor supporting the roof slab, so that the sequence of construction for each building necessarily was in substance: (1) Interior column supports would be installed and the concrete slab for the first floor poured; (2) after approximately one or two days for the hardening of the first floor slab, the brick and tile walls would be erected by a different crew of workmen; (3) columns for the interior support of the second floor slab and the second floor slab would be poured; (4) the second floor walls would be built; (5) columns for interior support of the third floor slab and the third floor slab would be poured; (6) the third floor walls would be built; (7) columns for the support of the roof slab and the roof slab poured; (8) parapets and penthouse would be erected; (9) insulation, paper, and tar covering would be put on the roof. The procedure was the same for two-story buildings, except that they did not include penthouses. As the work progressed on each floor, the necessary sleeves, conduits, pipes, and the like, would be placed to accommodate the plumbing and heating

and electrical wiring. After the building was closed in, plastering, interior carpentry, painting, and other interior work, would be performed.

6. For the coordination of the entire work it was planned to pour the floor slab of the first building and immediately thereafter to pour consecutively the first floor slabs of six more buildings. By the time the first floor slab of the seventh building had been poured, the brick and tile first floor walls of the first building would have been completed, and forms would have been erected for the interior supports at that level and the first building would be ready for the pouring of the second floor slab. By the time the second floor slab of the first building had been poured, the second building would be ready for the pouring of its second floor slab. This process would continue through the seven buildings and would be repeated for the third floors and the roofs. Thus, work on a number of buildings would progress simultaneously, while each class of work on each building would be done promptly and in proper sequence as respects the individual building. This plan of operation and the sequence of the work would permit an economical use of workmen, equipment, materials, and forms, and would result in minimum costs. A similar sequence was to have been followed in the remaining buildings.

7. In late September or early October of 1936, plaintiff delivered to the defendant a progress schedule, containing the sequence outlined above, and showing the proposed dates of commencement and completion of each of the various subdivisions of work required under the contract documents. At the request of the defendant and in order that the form should correspond with a similar progress schedule relating to the south sector of the project, plaintiff submitted a second progress schedule showing the same plan of operation, but in a somewhat different form. October 21, 1936, plaintiff submitted to the defendant a written statement of the sequence, by designated buildings, in which it expected to pour the first floor slabs. A written statement of modifications in the latter portion of this sequence was submitted by plaintiff to the defendant November 7, 1936.

### Delay—Drawings, Stonework

8. Certain drawings, referred to in the contract and specifications and made a part thereof, were sufficiently detailed that it was unnecessary for the defendant to furnish further drawings to enable plaintiff to execute the work involved in them. But there were, as in normal practice there usually are, detailed matters not shown in the contract drawings concerning which the defendant had to furnish what are called "full size" drawings before plaintiff could proceed with the work. Article 2 of the contract reads, in part:

"The Contracting Officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided."

The specifications read, in part:

"The general character of the detail work is shown on the drawings, but minor modifications may be made in the full size drawings or models. The Contractor and the Contracting Officer shall from time to time prepare schedules showing the dates on which the various detail drawings will be required, and the Contractor shall not attempt to execute any part of the work requiring such drawings until he has received the same" (General Conditions, Sec. 5, p. 8).

9. Where certain finished items of special design were required to be manufactured prior to installation, "shop drawings" for such items were to be prepared by plaintiff from details shown by full size drawings furnished by the defendant. With reference to such shop drawings, the specifications read in part:

"Shop drawings required by the Specifications generally will be checked and approved by the Architect and the Contracting Officer at Washington, D. C. The Contracting Officer may, in specific instances, direct that shop drawings be approved by the Architect and the Project Manager" (par. 1, p. 65).

10. The specifications, Division IX, p. 107, relating to stone work, read in part:

"Sec. 1. Scope of Work.

"1. The work includes all labor, materials, equipment and services required to furnish and set all stone to fully complete the project in accordance with the drawings and as specified.

\* \* \* \* \*

"Sec. 3. Shop Drawings.

"1. Shop drawings shall show all pieces, together with all anchorage, including completed setting details, subject to the provisions 'Shop Drawings.'

"Sec. 4. Cutting and Finishing.

"1. All cutting shall be done in strict accordance with the approved shop drawings."

11. On or about November 6, the first floor slab of the first building in the planned sequence had been poured and plaintiff was ready to proceed with the erection of the first story brick exterior wall and thereafter, at intervals averaging 3¼ days, became ready to erect the exterior walls of the remaining buildings. The stone trim for the front entrances had to be set into the walls as the brick was laid and the first story walls could not be completed until the stone trim had been cut to required shapes and dimensions at a stone mill and shipped to the site of the job. Plaintiff was required to furnish shop drawings, approved by the defendant, for the manufacture of the stones and it was necessary for plaintiff to have full size detail drawings in order to prepare shop drawings. In the usual course of manufacture and delivery, it required three weeks after shop drawings were approved by the defendant to get the finished stone delivered to the site of the job.

12. Ordinarily, full size detail drawings are furnished to the contractor at the time he is notified to proceed. Often they are supplied when the contract is signed, or shortly thereafter, and invariably they should be available to the contractor in ample time for the preparation, submission, and approval of shop drawings, and the manufacture and delivery of the material covered by them before it is needed in the course of construction. The defendant knew that the stone was needed for the first floor walls and that those walls would be among the earliest items of construction. The progress schedule furnished to the defendant by plaintiff about October first showed that plaintiff planned to commence the first floor walls of the first building on November 4. In the ordinary and usual course, it would be necessary for the full size detail drawing for the particular stone to be received by the contractor approximately five weeks before the stone was needed for setting into the wall.

The first full size detail drawings for entrance stone trim were received by plaintiff from the defendant on October 30, a week before stone was needed for the first building and 57 days after the date of the contract. No drawings for the first, second, fifth, seventh, eighth, ninth, eleventh, or fourteenth buildings in the planned construction sequence were included in that lot. The drawings for the third and thirteenth buildings were incomplete and complete drawings were included for only the fourth, sixth, and twelfth buildings. Additional drawings were received by plaintiff November 11, November 30, December 11, and December 12. Drawings for the first and second buildings in the planned construction sequence were not received until November 11; those for the third building were not received until November 30 and those for the fifth building until December 12.

Plaintiff requested prompt delivery of the drawings for stone trim on October 12, October 26, and again on November 5. On November 7, 13, 19, 21, and 30, and on December 5, 11, and 21, plaintiff protested in writing to the defendant against the continuing delay, and in several of the letters advised the defendant that extensions of time would be demanded and damages for delay would be claimed. No action was taken by the defendant upon the plaintiff's claims for damages.

13. Meantime, in the absence of full size detail drawings, plaintiff undertook to prepare shop drawings for the stone from information disclosed by the plans, and submitted such drawings to the defendant's architects for tentative approval, upon an understanding with the defendant's representatives at the site that the architects would recommend the usual corrections, which plaintiff would make before submitting final copies to the architects and to the Housing Division at Washington for approval, as the specifications required. The first shop drawings were submitted to the architects October 12 and the last November 14, 1936. In response to complaint by plaintiff over delay in getting tentative approval from the architects, the Director of Housing on November 18 wrote to plaintiff that no material was permitted to be fabricated without approval of shop drawings by the Housing Division at Washington, called attention to the fact that specified procedure required submission of drawings to the Housing Division at Washington, as well as to the architects, and advised compliance. Thereupon, plaintiff sent copies of all shop drawings to the Housing Division at Washington. After this was done, an average of nearly 25 days elapsed before approved drawings were returned to plaintiff, and none of the shop drawings were finally approved until after full size

detail drawings for the stone involved had been given by the defendant to plaintiff. Not more than two weeks would have been a reasonable time for the defendant to check and finally approve these shop drawings.

Most of the delay was caused by the failure of the architects to make tentative approvals or to submit to Washington the shop drawings approved by them, but a substantial delay occurred in the approval by the Housing Division at Washington. Had the full size drawings been furnished to plaintiff in time to submit and obtain approval of shop drawings in the ordinary course, the finished stone would have been delivered to the site of the work by the time the first floor slabs were poured and plaintiff was ready to proceed with the first-story walls. Instead, the delay in receiving the stone delayed laying the brick first-story walls. This, in turn, delayed the next operation in the sequence, and the delay continued accordingly into each of the classes in the planned sequence of the work.

14. Because of the disruption of plaintiff's planned operations and delay in the early units of the planned sequence, completion of the entire job was delayed. At least 47 days of delay in completion of the entire job is attributable to the delay of the defendant in furnishing full size detail drawings for stone work and its failure to cooperate in plaintiff's efforts to secure approval of shop drawings in the absence of full size drawings.

## Delay—Brick Work

15. The face brick prescribed by the specifications for the exterior walls was to approximate the characteristics in respect to color and texture of samples held for inspection at the office of the architect during the period of bidding and was of a kind known as Autumn Tint Brick. On November 17, in compliance with the specifications, plaintiff built a sample panel of brick wall. The brick conformed with the samples exhibited during the period of bidding. The brick were in two colors, some red and some buff. The defendant's architects examined the wall the day it was built and took exception to the mixture of colors in the sample wall. No delay in the construction of walls was occasioned by these objections.

16. There was some delay in the brick work due to a change order. On October 21, 1936, the defendant's architects wrote to plaintiff directing it to use shale brick for certain of the buildings. Shale brick was different from and more expensive than the specified Autumn Tint Brick and plaintiff advised the defendant that the use of shale brick would call for extra payment. The defendant determined to use shale brick to the extent of 30% of the entire amount of brick used, and on certain buildings. Plaintiff received a proceed order from the contracting officer on December 4, and on that day submitted a proposal for an adjustment of price due to the extra cost of shale brick. On June 18, 1937, a change order allowing the amount claimed in that proposal was issued by the contracting officer. The delay by the defendant in determining to proceed was not due to any act or fault of plaintiff. The delay was concurrent with the delay relating to full size drawings and shop drawings for stone and the final completion of the work was not delayed by the brick incidents.

## Delay—Steam for Testing Heating System

17. The specifications called for a heating system supplied by steam from a power plant located on the south sector of the project. Steam at relatively high pressure was to be distributed to the buildings by an underground main distribution system. The steam pressure was to be reduced by appropriate valves and the steam distributed through the buildings by a two-pipe low-pressure vacuum return system. Vacuum pumps operated by electric motors were essential to the operation of the low-pressure system in the buildings. Installation of the low-pressure system in the buildings, including the vacuum pumps, was a part of plaintiff's work under its contract. Construction of the power plant and main distribution system was not included in plaintiff's contract and the defendant was to furnish steam for testing purposes.

18. The specifications provided that, when the entire system had been completed, the system was to be blown out by steam to clean it, after which an eight-hour working pressure steam test on the entire heating system was to be conducted, followed by the adjustment of all apparatus so as to put it in proper working condition. Thereafter, a forty-eight-hour operating test was required. In order to conduct these tests it was necessary that electric power be available to operate the stoker at the power plant and the motors in the vacuum pumps.

19. Except as hereinafter stated with reference to electrical equipment, plaintiff

was ready for the steam tests on or about September 13, 1937, and on that day requested the defendant to provide steam for that purpose, but the defendant did not provide steam until October 13. For reasons not disclosed by the proof plaintiff did not commence the blowing out operations for five days after steam had been made available.

20. The reason steam was not supplied by the defendant prior to October 13, was that the utility company, which was the source of the electrical energy with which to operate the stoker at the power plant, did not supply the electrical energy until October 12. The utility company did not supply the electrical energy prior to October 12 because the defendant had not signed the contract therefor.

21. Earlier in the course of construction, plaintiff had furnished to the defendant samples of one of the types of vacuum pumps indicated in the specifications and they were approved by the defendant, after which approval they were installed by plaintiff. Later it was discovered that the wiring specified by the defendant was not heavy enough to conduct the load of electricity required to operate the pumps. Plaintiff called the attention of the defendant to this situation on July 30, 1937, and asked the defendant to direct what should be done. Having received no directions from the defendant, plaintiff made specific suggestions on September 13 for the installation of heavier wire. Plaintiff could not install the new wire until authorized by the defendant, and the defendant issued a proceed order September 18, authorizing plaintiff to proceed with the installation of the larger wire. Ultimate completion of the project was delayed by these circumstances about 10 days, but the delay was concurrent with the delay due to lack of steam for testing.

22. During the period between September 13 and October 13 plaintiff's subcontractor was engaged in work on transformer vaults in the north sector and it is possible, but not satisfactorily proved, that, even if the defendant had signed a contract for electrical energy, the utility company would have declined to supply power while some of this work was being prosecuted. The trouble which was being remedied by that work was due to two faults in design: first, one of the vaults was not waterproofed and, in addition, received drainage through conduits from manholes, causing fuses to blow under test, and, second,

the wiring circuits shown on the drawings produced an unbalanced electrical load, when a balanced load was essential. The latter defect in design was corrected under a plan worked out by the contractor. This work in the vaults was not due to delay or improper workmanship on the part of the plaintiff or its subcontractor.

23. The specifications provided that, after all specified tests had been made and approved, all low pressure steam mains and branches were to be covered with insulating material and three coats of paint applied. The delay in making tests delayed this work. The delay resulting from failure to receive steam when ready to test the heating system and due to the necessity of replacing wiring for the vacuum pumps resulted in a delay of 17 days in the ultimate completion of the entire job, in addition to the delay relating to drawings mentioned in findings 8–14.

### Delay—Sidewalks

24. Plaintiff was required by the plans and specifications to install certain sidewalks on Oakdale Avenue. October 11, 1937, after grading had been completed and curbs and forms installed, the City of Chicago stopped the work because of conflict with city ordinances. Plaintiff notified the defendant of this situation by letter dated October 14. After some correspondence between plaintiff and the defendant, on November 8, plaintiff was advised to proceed in accordance with the requirements of the city authorities. As the delay was concurrent with the ultimate delay in completion of the entire job caused by failure of plaintiff to receive drawings and in relation to the heating system, as set forth in findings 8–23, the delay in connection with the sidewalks did not result in any delay in the ultimate completion of the entire job.

### Delay—Cost of Forms

25. Plaintiff's plan of operation, more fully described in findings 4–6, was to pour the first floor slabs of seven buildings, then to follow with the second floor slabs and the remaining stories of such buildings. Plaintiff planned to proceed thereafter with the first floor slabs of the remaining buildings and to complete them in the same manner.

Because of delays relating to drawings for the stone work, plaintiff could not proceed as planned and, instead of pouring only the first floor slabs of the first seven buildings and then starting with second

floor slabs, plaintiff was required, in order to prevent further loss, to pour the first floor slabs of all the buildings before pouring the upper story slabs of the first seven buildings. In the planned sequence of construction plaintiff would have re-used form work from the first seven buildings, but under the revised sequence was obliged to purchase additional material and to build additional forms. Plaintiff's cost for the additional material was $4,853.24. No additional cost for labor in this regard is satisfactorily proved.

### Delay—Field Costs

26. Plaintiff incurred the following increased field costs each calendar day, for 47 calendar days, on account of delay by defendant with relation to full size and shop drawings, as set forth in findings 8–14:

| | Labor | Material and other expenses |
|---|---|---|
| 1. Concrete inspector | $ 9.17 | |
| 2. Superintendent | 22.00 | |
| 3. Assistant Superintendent | 12.14 | |
| 4. Carpenter foreman | 16.00 | |
| 5. Cement finisher foreman | 10.00 | |
| 6. Assistant mason foremen (2) | 27.20 | |
| 7. Assistant carpenter foremen (2) | 18.57 | |
| 8. Labor foreman | 7.86 | |
| 9. Lay-out man | 6.79 | |
| 10. Paymaster | 6.79 | |
| 11. Toolman | 5.86 | |
| 12. Assistant lay-out man | 5.71 | |
| 13. Assistant labor foremen (4) | 23.43 | |
| 14. Timekeeper | 5.71 | |
| 15. Material clerk | 5.71 | |
| 16. Office clerk | 4.11 | |
| 17. Water boys (3) | 5.57 | |
| 18. Watchmen (6) | 21.60 | |
| 19. Janitor, Field Office | 3.60 | |
| 20. Field office maintenance | 1.97 | |
| 21. Field office heat | 1.97 | $1.00 |
| 22. Lights for construction | 8.57 | 2.00 |
| 23. Fire insurance | | 5.08 |
| 24. Field office telephone | | 1.00 |
| 25. Field office light | | .25 |
| Total per calendar day | 230.33 | 9.33 |
| Total labor | 230.33 | |
| Total materials and other expenses | | 9.33 |
| Insurance on labor at 0.05691 | 13.11 | |
| Social Security on labor at 0.03 | 6.91 | |
| Total increased cost per calendar day | 259.68 | |
| Increased field cost for 47 calendar days | 12,204.96 | |

27. (a) Plaintiff owned certain items of equipment which it used on the work here involved and which, because of the delays in connection with the full size and shop drawings, it was obliged to keep on the job 47 calendar days longer than would have been required had such delays not occurred. The items of equipment and their reasonable rental value per calendar day are as follows:

| | |
|---|---|
| 1. 1-yard concrete mixer | $10.71 |
| 2. ¾-yard concrete mixer | 7.14 |
| 3. Bins | 7.14 |
| 4. Crane and bucket | 17.86 |
| 5. Trucks (5) | 25.00 |
| 6. Saw plant | 1.43 |
| 7. Surveyor's level | .36 |
| 8. Surveyor's transit | .36 |
| Total rental value per calendar day | 70.00 |
| Rental value for 47 calendar days | 3,290.00 |
| Less fifty percent reduction for non-use | 1,645.00 |
| Compensation to which plaintiff is entitled | 1,645.00 |

There is no evidence of any other planned use of this equipment by plaintiff during that period.

(b) Plaintiff rented four hoist engines from the Thomas Hoist Company and paid therefor $12 per day for a five-day week, or $8.56 per calendar day, and, because of the delay described above, plaintiff was obliged to keep them on the job 47 calendar days longer than would have been required had the delay not occurred. The cost for 47 calendar days was $402.32.

28. Plaintiff incurred the following increased field costs each calendar day, for 17 calendar days, on account of the delay caused by the defendant with relation to steam for testing the heating system, as set forth in findings 17–23.

| | Labor | Material and other expenses |
|---|---|---|
| 1. Superintendent | $22.00 | |
| 2. Assistant Superintendent | 12.14 | |
| 3. Carpenter foreman | 16.00 | |
| 4. Labor foreman | 7.86 | |
| 5. Paymaster | 6.79 | |
| 6. Timekeeper | 5.71 | |
| 7. Material clerk | 5.71 | |
| 8. Office clerk | 4.11 | |
| 9. Water boys (3) | 5.57 | |
| 10. Watchmen (6) | 21.60 | |
| 11. Janitor | 3.60 | |
| 12. Field office maintenance | 1.97 | |
| 13. Field office heat | 1.97 | $1.00 |
| 14. Lights for construction | 8.57 | 2.00 |
| 15. Fire insurance | | 5.08 |
| 16. Field office telephones | | 1.00 |
| 17. Field office light | | .25 |
| Total per calendar day | 123.60 | 9.33 |
| Total labor | 123.60 | |
| Total materials and other expenses | | 9.33 |
| Insurance on labor at 0.05691 | 7.03 | |
| Social Security on labor at 0.03 | 3.71 | |
| Total increased cost per calendar day | 143.67 | |
| Increased field cost for 17 calendar days | 2,442.39 | |

Delay—General Office Overhead

29. With unimportant exceptions, the Lathrop job was the only job being done by plaintiff from September 1936, to December 1937, inclusive, and the general office overhead, if allocable in proportion to the cost of the various jobs done, would be allocable almost entirely to the Lathrop job. The exact amounts appear later herein.

From September 1936, to October 1937, inclusive, plaintiff's general office overhead varied from $5,001.45 to $6,400.49 per month, the average being $5,489.80. This included rent, employees' salaries, stationery, taxes, advertising, and similar items. It included also the salaries of Henry Ericsson and his three sons, Clarence E. Ericsson, Walter H. Ericsson, and Dewey A. Ericsson, the four of whom were the officers and the owners of the stock of the plaintiff corporation. Their aggregate monthly salaries from September 1936, to January 1937, inclusive, were $2,128 and from February 1937, to October 1937, inclusive, were $2,314.66.

After the first of November 1937, when the job was approximately 98% completed, the board of directors, composed of the four Ericssons, increased their salaries as officers to the aggregate sum of $6,000 per month, the increases to commence retroactively as of January 1, 1937, except in the case of Dewey A. Ericsson, whose increase was to commence as of February 1, 1937.

The individual monthly salaries before and after the increases were:

|  | Prior to November 1937 | Amount to which increased |
|---|---|---|
| Henry Ericsson | $634.66 | $1,500.00 |
| Clarence E. Ericsson | 560.00 | 1,500.00 |
| Walter H. Ericsson | 560.00 | 1,500.00 |
| Dewey A. Ericsson: | | |
| September 1936–January 1937 | 373.00 | |
| February 1937–October 1937 | 560.00 | 1,500.00 |

November 4, 1937, the four Ericssons were paid an aggregate of $37,040.06 for back salaries authorized by the increase, and the amount was charged to "Officers Salary Account" and included in the general office overhead.

The deductibility of salaries as an expense in the computation of corporate income tax had some influence on the increase in salaries, but the increases were made in pursuance of a policy of long standing. When the corporation had a large volume of business and the Ericssons were doing more work, salaries were more liberal and when it was necessary to retrench in bad years, the salaries were reduced. The average of aggregate monthly salaries for fourteen years prior to the increase here involved was approximately $3,360. The increases were not proportionate to the stock ownership, but such increases were given only to the Ericssons, who owned the stock. The relative stock ownership among the Ericssons is not shown by the record.

The record does not show the nature and extent of services rendered to the corporation by the Ericssons. Dewey A. Ericsson was closely connected with the Lathrop job in a supervisory capacity, but the record does not disclose what connection the other Ericssons had with the business of the corporation except that they were the owners of the stock, were the officers, and, together with Dewey, "operated the company." What services they rendered, what their duties were, what their qualifications and abilities were, what a reasonable compensation for their services would be, do not appear from the record.

There was no causal connection between the increase in officers' salaries and the delays set forth in findings 8–23. Continuing items of general office overhead such as insurance, office rent, office employees' salaries, taxes, and depreciation were not increased because of such delays. Plaintiff did not forego any other business on account of such delays. Except for the salary of an office clerk, included in the items of the field costs in finding 26, it is not proved that general office overhead was actually increased by reason of the delays set forth in findings 8–23.

30. The field cost from September 1936 to December 1937, inclusive, of all jobs done by plaintiff, the field cost of the Lathrop job, the percentage of the whole allocable to the Lathrop job, the entire general office overhead, and the portion allocable to the Lathrop job in the same proportion that its field costs bore to the whole are as follows:

Not Including Pay Increases

| Cost of all jobs | Cost of Lathrop job | Percentage allocable to Lathrop job | All general office overhead | Amount allocable to Lathrop job |
|---|---|---|---|---|
| | | *Percent* | | |
| $1,734,730.12 | $1,720,650.47 | 99.188 | $ 87,712.86 | $ 87,000.63 |

Including Pay Increases

| $1,734,730.12 | $1,720,650.47 | 99.188 | $132,123.60 | $131,050.76 |
|---|---|---|---|---|

Upon the basis of the foregoing table, general office overhead allocable to the 64 days' delay relating to drawings and to the heating system, as set forth in findings 8–23, would be:

If the Pay Increase of November 1 Is Not Included

| Overhead allocable to Lathrop job | Total days | Amount per day | Amount allocable to 64 days' delay |
|---|---|---|---|
| $ 87,000.63 | 487 | $178.65 | $11,433.60 |

If the Pay Increase of November 1 Is Included

| $131,050.76 | 487 | $289.10 | $17,222.40 |
|---|---|---|---|

Delay—Interest on Deferred Payments

31. Article 16 of the contract provided that in making monthly partial payments on estimates of work performed and materials delivered to the site of the job, 10 percent of the estimated amounts would be retained by the defendant until final completion and acceptance of all the work covered by the contract, with authority in the Contracting Officer to relax the reservation in some respects. As a result of the delays relating to drawings and to the lack of steam for testing the heating system, plaintiff was not paid the deferred percentages until 64 days later than it would have been paid otherwise. The exact amount of the deferred payments is not shown, but it was not less than $104,207.50, and plaintiff claims to be entitled to interest at the rate of 6 percent per annum on the amount thereof for the number of days it was deprived of the deferred payments by reason of the delays.

Delay—Wage Rate Increases

32. There were union wage rate increases on the work here involved applicable to certain mechanics June 1, 1937, and to certain other mechanics July 1, 1937. Some of the work performed by these mechanics after June 1 and July 1, respectively, would have been completed prior to those dates had the job not been delayed in connection with shop drawings and full-size drawings and plaintiff was obliged to expend for such labor more than it would have otherwise been obliged to spend. The evidence does not show the extent of that labor or the amount of the excess expenditures.

Temporary Heat

33. Section 17 of the General Conditions of the specifications, providing for temporary heating, if necessary, reads:

"1. The Contractor shall provide temporary heating and covering as necessary and to the satisfaction of the Contracting Officer to protect all work and material against dampness and cold.

"2. The Contractor shall furnish all necessary fuel and attendance to supply temporary heating sufficient to maintain a temperature not less than 50 degrees F. throughout each building from the time plastering is commenced until the building· is accepted. For such purposes the Contractor shall supply such heating equipment as may be required and/or he may utilize with the approval of the Contracting Officer the heating equipment to be installed under the Contract Documents, or such portions thereof as are ready and available, provided that he shall leave the same in proper and acceptable condition upon completion of the work. Salamanders or other open fires will not be permitted in the buildings" (p. 10).

34. Had it not been for the delays hereinabove described, the entire job would have been completed by September 23, 1937, and the plaintiff would not have been required to furnish temporary heat during the fall and winter of that year.

The entire job was substantially completed by November 9. Except for the covering and painting of pipes in the heating system, there remained to be done only certain plumbing and electrical work of a minor character, and inspections. Acting upon written assurance of the project manager in the field and of a special representative of the defendant from Washington, D. C., who had gone to Chicago to make an inspection, Contracting Officer R. E. Doherty, by letter to plaintiff forwarded November 30, accepted the work as of November 9 and certified that it had been completed as of that date. Thereafter Doherty was succeeded as Contracting Officer by H. L. Campbell.

35. On October 2 plaintiff wrote to the defendant calling attention to the fact that as a result of delays in furnishing drawings, temporary heat would be required and requested that the defendant furnish the heat. On October 12 the defendant wrote to plaintiff stating that under the specifications plaintiff was required to furnish such heat. On October 21 plaintiff replied to the defendant's letter of October 12, reiterating its demand that temporary heat be furnished at the expense of the defendant. On October 27, the defendant replied, again directing that the plaintiff make arrangements for heat, at plaintiff's expense. On December 3 the defendant assumed custody and maintenance of the property. Meantime, in order to prevent injury to the property from the cold and to maintain the temperature required by the specifications, plaintiff procured steam for the period November 9 to December 3, from the power plants on the south sector at a cost of $9,324.83.

On December 28, 1937, plaintiff requested the defendant to issue a change order for the cost of temporary heat from November 9 to December 3, and submitted a proposal of $7,739.58 therefor. A similar demand and proposal of January 5, 1938, revised the sum claimed to $8,472.30. On January 31, 1938, the defendant wrote to plaintiff rejecting the demand and returning the proposal. On February 2 plaintiff wrote to the Administrator of the United States Housing Authority, successor to the Federal Emergency Administrator of Public Works, defined in the contract as "Head of Department" for the purpose of appeal, protesting the ruling of January 31, and requesting that a change order be issued. On February 23 the Acting Director of Federal Construction replied for the Administrator and denied plaintiff's demand of February 2. On March 19 the Acting Director again wrote to plaintiff and, referring to the letter of November 30, 1937, from the then Contracting Officer, Doherty, stated that Doherty's letter of November 30, accepting the property as being substantially completed November 9, was not justified by the facts, and further asserted that December 3 was the date of acceptance.

36. On March 22 plaintiff protested in writing to the Acting Administrator against the decision and on March 24 appealed in writing to the Administrator from the decision of February 23. On May 18 the Administrator rejected plaintiff's claim for the cost of temporary heat and found as follows:

"1. That on November 3, 1937, you notified Mr. H. A. Gray, former Director of Housing, that you would be ready on November 12, 1937, for final inspection of the work in your contract, and you requested that such inspection be made at that time;

"2. That on November 9, 1937, the Government field representatives reported that your contract could then be considered substantially complete;

"3. That on or about November 9, 1937, final inspection of your contract work by Government representatives started, resulting in the development of Punch Lists of items of unfinished contract work;

"4. That during the month of November, specifically on the dates of November 18, 19, 22, 23, 24, and 26, you notified the Project Engineer, Mr. D. D. Meredith, that the remaining items on the final Punch List for certain buildings had been completed and you requested final acceptance of the particular buildings mentioned in each of your letters; that, in your letter of November 26, you also notified the Project Engineer that—"all items are now completed on all of our buildings and are ready for final acceptance";

"5. That on November 30, 1937, an undated letter was forwarded to you signed by Mr. R. E. Doherty, former Contracting Officer, which stated that it confirmed the acceptance of your work on November 9,

1937, subject to certain conditions and requirements;

"6. That as of November 30, 1937, the Authority had not accepted your work, therefore the former Contracting Officer could not confirm an acceptance;

"7. That during the period November 9 to November 29, 1937, alone, our records show that you employed a daily average of about eighty-six (86) men at the project, in connection with the completion of your contract;

"8. That on December 1, 1937, you addressed a letter to Mr. R. E. Doherty, former Contracting Officer, that there were still a few items of contract work unfinished, but that they were of such a nature as not to prevent Government use and occupancy of the buildings, and you requested immediate acceptance of the project.

"9. That on December 3, 1937, the Government did actually take over from you the possession of the premises and relieve you of further maintenance of the buildings and utilities included in your contract;

"10. That on January 28, 1938, and not before, did you complete all Punch List Items in accordance with contract requirements;

"11. That on January 31, 1938, Mr. E. C. Curtis, Acting Project Manager, acting under instructions of the present Contracting Officer, Mr. H. L. Campbell, wrote you that the Government did not contemplate reimbursing you for maintenance expenses incurred by you prior to December 3, 1937, the date the United States Housing Authority actually took possession of the work under your contract;

"12. That on February 2, 1938, you protested, under Section 10, Paragraph 2, of the General Conditions of the Specification, the ruling contained in the Acting Project Manager's letter to you of January 31, 1938, as being unfair and not in accordance with the terms of the Contract or Specification, and asked that a Change Order in the amount of Eight Thousand Four Hundred Seventy-Two Dollars and Thirty Cents ($8,472.30) be issued;

"13. That on February 23, 1938, the Contracting Officer advised you that it was his final decision that no such Change Order should be issued;

"14. That on March 19, 1938, for the purpose of clearing up the discrepancy in the records concerning the date of acceptance, you were informed by the Contracting Officer that the correct date of acceptance of your contract work was December 3, 1937, and not November 9, 1937, as stated in letter from the former Contracting Officer, forwarded to you November 30; and

"15. That the Authority was not obligated under the contract to accept your contract work until it was entirely completed."

In failing to give any consideration to the delays which created the necessity for the temporary heat and to the nature of the work performed between November 9 and December 3, the defendant deprived the plaintiff of its right under the contract to an administrative consideration and decision of the question, if the contract required the defendant to give the plaintiff such a decision.

Laundry Tables

37. The contract drawings showed the location of certain laundry tables in basements, but neither the drawings nor specifications showed the character, design, dimensions, or materials from which the cost of such tables could be estimated or the tables could be fabricated and installed, or showed the tables in such a manner as to indicate that it was intended that they should be included in the work required under the base bid. In other instances where locations of similar household equipment, such as ironing boards, kitchen cabinet, kitchen work tables, gas plates, and electric refrigerators, were shown on the drawings and were required to be furnished by plaintiff under the contract, the specifications described the equipment with particularity. The defendant, nevertheless, directed plaintiff to construct and install tables at the locations indicated as a part of the work under its contract.

Plaintiff installed the tables at a cost of $496.34, duly protested in writing to the Contracting Officer against being required to furnish the tables without additional compensation and demanded compensation for them. On December 1, 1937, the Contracting Officer advised plaintiff in writing that it was his final decision that plaintiff was required to furnish such tables under the contract. Plaintiff did not take an appeal from this decision to the head of the department.

Tree Pits

38. Under the plans and specifications tree pits were to be made by digging holes and filling them with a mixture of clay

and sand in preparation for the later planting of trees by the landscape gardener. Contract drawings A & L–5, A–12, A–13, and A–14, show proposed tree pits between the sidewalk and the street curb on Clybourn Avenue. This area is outside the property line of the project, as is shown by Property Line Map No. A–4. The proposed tree pits are indicated on the drawings in the same manner as tree pits inside the property line and plaintiff had as much information about those outside the line as those inside the line. Plaintiff prepared all tree pits inside the property line as part of its contract work. All the foregoing drawings are in evidence as a part of the defendant's exhibit R, and are made a part of these findings by reference.

39. February 24, 1937, the defendant ordered plaintiff to grade the area between the sidewalk and the curb on Clybourn Avenue, which grading was not a part of the contract work and about which grading there is no dispute. The order also directed plaintiff to omit the preparation of tree pits in the area. Plaintiff performed the work and submitted a proposal in which it specified a price of $959.17 for the grading, which, with overhead and profit, totalled $1,158.18. Plaintiff also stated that no credit on the contract price would be allowed to the defendant for the omission of the tree pits, because preparation of tree pits in that area was not a part of the contract work.

March 23, 1938, the Contracting Officer issued Change Order No. 56, increasing the contract price by $219.82. In his letter to plaintiff transmitting the change order he stated his computation of the price increase as follows:

The computation on which the Change Order is based is as follows:

| | |
|---|---|
| Additional work as itemized by your proposal | $957.17 |
| Credit for omission of tree pits: | |
| 330 cubic yards excavation at $1.35..... $445.50 | |
| 330 cubic yards clay fill at $1.00........ 330.00 | |
| | 775.50 |
| | 181.67 |
| Overhead, 10% ............................. | 18.17 |
| | 199.84 |
| Profit, 10% ................................. | 19.98 |
| | 219.82 |

The Contracting Officer also stated in his letter that it was his final decision that the tree pits were originally included in the contract and that the defendant was, therefore, entitled to credit when they were omitted from the work. On March 25, plaintiff protested this decision by letter to the Contracting Officer and demanded the full sum of $1,158.18. On April 13, the Contracting Officer replied to plaintiff in writing and reaffirmed his decision of March 23.

40. On April 21, plaintiff appealed to the Head of the Department from the Contracting Officer's decision of March 23, as reaffirmed by his letter of April 13. July 25, the Head of the Department made his findings of fact and determined that the tree pits in the area in question were included in the contract price.

41. The specifications at page 67 read, in part:

"Excavating, Filling, and Grading
\* \* \* \* \* \*

"Sec. 1. Scope of Work.

"1. The work includes all labor, materials, equipment, and services necessary to do all excavating, filling, and grading (except that part covered by the foundation contract) required to fully complete the project as shown on the drawings and as specified (see General Work).
\* \* \* \* \* \*

"Sec. 2. Materials.

"1. Material for filling tree pits, planting areas, vine pockets, and the top 6-inch layer of the subgrade in all unsurfaced areas shall be clean yellow clay containing fine sand and shall be free from coarse sand, gravel, cinders, or other foreign matter.
\* \* \* \* \* \*

"3. Material for filling (except filling for tree pits) at depths *greater than 2 feet* below subgrades shall be entirely free from junk and rubbish but may contain cinders, slag clinkers \* \* \*."

The general description of the work appears on page 25 of the specifications under two heads: (1) The Project Site and (2) The Scope of the Work, as follows:

"Sec. 1. The Project Site.

"1. The Project Site for Base Bid No. 1 shall include the entire area north of the north line of Diversey Parkway within the property lines as indicated on the Property Line Map No. A–4.

"Sec. 2. Scope of The Work for Base Bid No. 1.

"1. The Bidder shall include in his proposal for Base Bid No. 1 all labor, materials, equipment, and services necessary for

or incidental to the completion of the North Sector of the Project in accordance with the Drawings and the Specification, except the following: [Tree pits are not mentioned in the exceptions.]

\* \* \* \* \* \*

"Note B.—All work indicated on the drawings and/or specified to be done on or in the streets abutting the Project Site *shall be* included in the *Base Bid* No. 1."

The specifications, at page 75, read in part:

"Street and Yard Improvements

"Sec. 1. Scope of work.

"(d) On Diversey Parkway and Clybourn Avenue the only street work covered by this Division of Specifications consists of closing, (by construction of sidewalk, curb and gutter, etc.) the existing driveway entrances and provision of new driveway entrances as indicated on the drawings."

Article 2 of the contract reads in part:

"Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both."

The tree pits in the area in question clearly appear in the drawings, and the decisions of the Contracting Officer and the Head of the Department with respect thereto were right.

42. The following is a summary of costs to plaintiff because of delay caused by the defendant as set forth in preceding findings, not including interest on deferred payments:

43. The change orders extending the time of completion to December 6, 1937, were agreed to by plaintiff, without protest as to the amounts therein recited; each such change order contained the following clause, to wit:

This Change Order expressly satisfies any and all claims against the United States of America and the United States Housing Authority of whatever nature or purpose incidental to or as a consequence of the change herein described.

In agreeing to the change orders, it was not the intention of the parties that any questions or disputes arising under the contract, and not relating to the subject matter of the change orders, should be compromised or waived by the granting or acceptance of the change orders.

Herman J. Galloway, of Washington, D. C. (King & King and Harry D. Ruddiman, all of Washington, D. C., on the brief), for plaintiff.

Currell Vance, of Washington, D. C. and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff on September 3, 1936, made a contract with the United States Public Works Administration for the construction of the superstructure of the north sector of the Julia C. Lathrop Homes in Chicago, Illinois, for a consideration of $2,097,600. The contract obligated the plaintiff to complete the work within 365

| | Not including general office overhead | Including general office overhead | |
| --- | --- | --- | --- |
| | | Not including increases in officers' salaries | Including increases in officers' salaries |
| Delay, Forms (finding 25) | $4,853.24 | $4,853.24 | $4,853.24 |
| Delay, Drawings (finding 26) | 12,204.96 | 12,204.96 | 12,204.96 |
| Delay, Compensation for equipment (finding 27a) | 1,645.00 | 1,645.00 | 1,645.00 |
| Delay, Rental of equipment (finding 27b) | 402.32 | 402.32 | 402.32 |
| Delay, Steam for testing (finding 28) | 2,442.39 | 2,442.39 | 2,442.39 |
| Delay, Temporary heat (finding 35) | 9,324.83 | 9,324.83 | 9,324.83 |
| General office overhead (finding 30) | | 11,433.60 | 17,222.40 |
| Total | 30,872.74 | 42,306.34 | 48,095.14 |

days after the receipt of notice to proceed. Notice was received on September 23, 1936, which fixed the completion date as September 22, 1937.

The plaintiff made a plan for the orderly and economical performance of its work. It was to build 17 buildings, containing in all 484 apartments with a total of 1690 rooms. Eleven buildings were to be 3 story buildings, five 2 story and one, the administration building, one story. The outside foundation walls had already been built. The sequence of the work in each building was first to place the interior foundation columns and the concrete slabs of the first floors which were to rest on the foundation walls and columns; then build up the brick exterior walls backed with tile, and the interior partitions; then place the interior columns to support the second floor and pour the concrete slab of that floor, resting it on the walls and columns; then build up the exterior walls to the next floor, and so on to the concrete slab roof, covered with insulation, paper and tar, and the parapets and penthouse on top of it. Plastering, wood finishing, and painting were to be done when the buildings were enclosed.

The plaintiff planned to move its gangs of labor of the various trades, its machines, and its form lumber, from one building to the next, while waiting for the concrete of each floor to dry sufficiently to permit the placing of the next tier of walls on that floor. It planned to carry seven buildings along in that sequence. But it was seriously delayed, almost at the outset, by the Government's failure to furnish full size drawings showing how the stone trim for the front entrances of the buildings was to be shaped. Without these drawings the plaintiff could not prepare its shop drawings for the manufacture of the stone; the stone could not be manufactured; and the plaintiff could not complete the exterior walls of even the first floor of the buildings, nor any work coming after that in sequence. Though it was obvious when the contract was made that the full sized drawings would be needed even before the work began, in order to enable the plaintiff to obtain the stone by the time it would be needed, the first of them arrived on October 30, fifty-seven days after the date of the contract and thirty-seven days after the plaintiff had been directed to proceed with the work. When the first full size drawings were received they were for only a part of the buildings, the buildings they related to were not contiguous, and the drawings were incomplete even as to some of the buildings to which they related. The plaintiff had tried in the meantime to avoid some of the delay by improvised procedures but was not permitted to do so.

We have found that as a consequence of the defendant's delay in furnishing the full sized drawings, the plaintiff was delayed forty-seven days in completing its work. The proved damages resulting from this delay were the costs of job and main office overhead; the cost of having its machinery tied up on the job; the cost of additional form lumber which the plaintiff was obliged to buy because its plan of work was disrupted; and the cost of furnishing heat to the buildings for a period at the end of the contract, after the time when the plaintiff would have had the job completed and turned over to the Government, but for the delay.

The completion of the job was further delayed by the failure of the Government to have steam available for the cleaning and testing of the pipes and radiators installed by the plaintiff. The boilers for the heating system were in the south sector of the project, built by another contractor. The steam was brought from the boilers by mains to the plaintiff's sector, and was there transmitted to the equipment installed by the plaintiff. The contract provided that the steam should be turned into the equipment installed by the plaintiff, first to clean it, and then to test it. But the steam could not be turned in until electricity was available to operate the stokers at the power plant and the motors in the vacuum pumps on the steam lines. The plaintiff was ready for the steam tests about September 13, 1937, or would have been except for unreasonable delay by the defendant in making up its mind that electric wire heavier than that specified would be required to operate the pumps. But no steam was available until October 13 because the public utility company which was to supply the electricity did not connect its lines to the project until October 12. We have found that the reason it did not do so was because the Government had not signed a contract with the utility company arranging for the service. The Government says that this finding is based upon hearsay testimony. The testimony was hearsay, but it was not objected to, and the Government had ample opportunity to prove the true facts if they were different from the testimony. Hence

our finding is based not only on the hearsay testimony, but upon the corroborative fact that it stands uncontradicted. For the Government to delay the completion of the project for 17 days, as we have found, by failing, without explanation, to make arrangements with the public utility company for electric service, was a breach of contract. We have found that damage to the plaintiff resulted from this delay, and have awarded compensation therefor.

■ The plaintiff seeks to recover the cost of certain laundry tables which it was directed to install, though the specifications were ambiguous and, the plaintiff asserts, did not require the contractor to install them. The contracting officer decided the question against the plaintiff. The plaintiff did not appeal to the head of the department, as it had a right to do under the contract. It cannot, therefore, obtain relief here, even if the contracting officer's decision was wrong, which we do not decide.

■ The plaintiff complains that in change order No. 56, which required grading of the area between the sidewalk and the curb on Clybourn Avenue, not required by the original contract, the Government deducted from the compensation for the grading the cost of preparing certain tree pits in the area which, the Government said, the plaintiff was required by the contract to do, but which, the plaintiff says, it was not required to do. The contracting officer and the head of the department on appeal decided this question against the plaintiff, rightly, we think. The plaintiff's contention is highly technical. The contract drawings showed the proposed tree pits, as well as others elsewhere on the project. But the area, between the sidewalk and the curb, where these pits were shown was outside the property line of the project, as shown by a Property Line Map. We have no doubt that the plaintiff, when it bid on the project without seeking a clarification of this contradiction, expected to have to prepare the pits. If so, the officers were right in deducting their cost when the work was omitted.

■ In computing the plaintiff's damages resulting from the delays caused by the Government's breaches of contract, we have included certain elements to which the Government objects, and omitted others for which the plaintiff contends. We have included compensation for machinery owned by the plaintiff and rendered idle by the delay, and have, because of the absence of wear and tear upon it, awarded one-half of the fair rental value of it. Brand Investment Company v. United States, 102 Ct.Cl. 40, 58 F.Supp. 749, certiorari denied, 324 U.S. 850, 65 S.Ct. 684, February 26, 1945. We have included a proportionate part, in this case substantially all, of the plaintiff's main office overhead for the period of the delay. Brand Investment Company v. United States, supra. In computing the main office expense we have not included a large increase in the salaries as officers of the four members of the Ericsson family who owned the plaintiff corporation. The increase was not made until after November 1, 1937, when the work was substantially completed, and was then made retroactive to January 1, 1937. It was made more as a distribution of profits than as a normal compensation for services rendered, so far as the proof shows.

■ The Government asserts other impediments to the plaintiff's right to recover. It says that, since the work was completed within the contract time, as extended by change orders, any delay caused by the Government cannot be regarded as a breach of contract. The original completion date was September 22, 1937. During the progress of the work the Government gave the plaintiff several change orders, each extending the time for performance by a specified number of days, the total extensions aggregating 74 days. Some of these change orders involved new or different work. One merely gave more time because of a strike of plasterers. There was no relation between these change orders and the delays which we have found to be breaches of contract. The changes covered by the orders did not in fact delay completion of the work by seventy-four days, or any other substantial period of time. They were not given by the Government, or accepted by the plaintiff, as a compromise or settlement of any dispute between the parties as to whether there had been delays, involving breaches of contract, not related to the subject matter of the change orders. In these circumstances the acceptance of the change orders does not foreclose the plaintiff from a remedy for breaches of contract which in fact delayed and damaged it. The Government urges that we held otherwise in the case of Sanders v. United States, 60 F.Supp. 483. But in that case we concluded that the change order was intended, as regarded the addi-

tional time given, to foreclose any question between the parties as to the duty to complete, or the right to complete, the contract earlier than the date designated for completion in the change order. In the instant case we do not think there was any such intention.

The Government contends that the plaintiff is foreclosed from recovery for the cost of heating the buildings for the period from November 9 to December 3, 1937. We have found that the reason why the plaintiff was still on the job and responsible for the temperature in the buildings at that time was because the Government had delayed the plaintiff in connection with the stone work and the turning on of the steam. The contract made the plaintiff responsible for the temperature in the buildings until the Government accepted the work as completed. The plaintiff asked for a change order compensating it for the cost of the heat during the period in question, asserting as a reason the fact that it would have been finished and gone but for the delays caused by the Government. The contracting officer refused the change order and the plaintiff appealed to the head of the department. He made fifteen numbered findings, none of which related to the plaintiff's contention as to the reason why it has been subjected to this expense. We find no indication in this decision denying the plaintiff's claim that the officer who decided it was aware of the basis of the claim. In those circumstances we cannot say that the plaintiff has had the hearing and decision to which the contract entitled him, and is foreclosed from coming here. We see no point in applying words such as "aribitrary," "capricious," or "bad faith," which are obviously inapplicable, in order to reach the result which justice demands. We think that unawareness of the problem on the part of the deciding officer is an equally good reason why his decision should lack finality. We do not decide whether his decision would have been final if he had been aware of the problem and had intended to decide it.

We conclude that the plaintiff is entitled to recover $42,306.34.

It is so ordered.

WHALEY, Chief Justice, and WHITAKER and LITTLETON, Judges, concur.

JONES, Judge, took no part in the decision of this case.