**HOUSTON READY–CUT HOUSE CO. et al. v. UNITED STATES.**

No. 47793.

United States Court of Claims.

Decided April 3, 1951.

William M. Aiken, Washington, D. C., Amy Ruth Mahin, Washington, D. C., of counsel; Covington, Burling, Rublee, O'-Brian & Shorb, Washington D. C., on the brief, for plaintiffs.

James J. Sweeney, Washington, D. C., Newell A. Clapp, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiff, Houston Ready-Cut House Company, is a prefabricator of dwelling houses. Plaintiff, Liberty Builders, Inc., is a corporation having the same officers and stockholders as Houston Ready-Cut House Company and is engaged in erecting houses prefabricated by that company. On April 2, 1942, both corporations entered into a written contract with the United States whereby they agreed to prefabricate, transport, construct, and erect 500 dwelling units

at a proposed defense housing project site in the vicinity of Texarkana, Texas. The consideration to be paid and the work to be performed were divided into two parts, the contract providing in part:

"Article 1A. *Statement of work under Part I.*—The Contractor shall prefabricate 500 dwelling units in the following unit and total prices and deliver such units to the Government at locations designated by the Contracting Officer:

\* \* \* \* \* \*

Article 1B. *Statement of work under Part II.*—The Contractor shall erect the dwelling units at the proposed Defense Housing Project site at Texarkana, Texas, and shall receive at the locations designated by the Contracting Officer, locate in place, install and connect ready for use all equipment necessary for a turn-key job in the numbers and at the locations designated at the following unit and total prices: \* \*"

The times for delivery of units under Part I for their erection under Part II were specified in Article 1B of the contract:

"The times of deliveries of units shall be as specified in the Schedule of Deliveries for Part I of the Contract, which will be furnished by the Contracting Officer, but, in any event, all units shall be delivered within 120 consecutive days from and after the date of the formal Notice to Commence Deliveries.

"The work for Part II of this contract shall be commenced as soon as but not later than the date set forth in the Notice to Proceed with such work, and shall be completed in accordance with a schedule of completion to be furnished by the Contracting Officer, but in any event within 140 consecutive days after the date for the commencement of work for Part II as set forth in said Notice."

The contract as signed is in evidence. Attached to the contract proper and made a part thereof by reference are "General Conditions for Prefabrication, Transportation, and Erection." These general conditions amplify the contract and, in part, provide as follows:

"h. The intent of the document is to divide all work in this document into two parts, Part I and Part II.

"i. The work under Part I shall consist of all prefabrication work and shall include the cost of all work necessary to deliver the completely prefabricated unit at the place required by Part I hereof.

"j. The work under Part II shall include the cost of transportation from and after the point of delivery and all erection work.

"k. Work under Part I shall ratably cease, and work under Part II shall ratably commence when the Government takes legal title to the units by the acceptance of them in carload lots F. O. B. common carrier.

"l. This division of the work shall be observed just as if two contracts, one for Part I and one for Part II, were entered into, and the failure of the form of this document to observe strictly the distinction shall not in any manner affect the substance of the distinction. The performance bond shall cover the contractor's obligations under Part I and II hereof. The payment bond shall cover only the contractor's obligations under Part II hereof.

\* \* \* \* \* \*

"8. (c). [Applicable to Part II only.] When two or more contracts are being executed at one time on the same or adjacent land, in such manner that the work on one contract may interfere with the work on another, the Contracting Officer shall decide which contractor shall cease work and which continue, or whether the work on both contracts shall progress at the same time and in what manner. When the territory of one contract is the necessary or convenient means of access for the transportation or movement of men, machines, animals, or appliances for the execution of another contract, such privilege of access or any other reasonable privilege may be granted by the Contracting Officer to the contractor desiring it, to the extent, amount, in the manner, and at the time as the Contracting Officer may, in his discretion, deem advisable. Any decisions as to

the method or time of conducting the work or the use of the territory shall not be made the bases of claims for delay or damage. The Contractor shall not cause any unnecessary hindrance or delay to any other contractors on the premises, and shall be responsible for all damages done to the work of such other contractors by 'him or by his employees.

\* \* \* \* \* \*

"18. *Care of Work*

"a. The Contractor shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for the proper care and protection of all materials delivered and work performed until completion and final acceptance.

"b. The Contractor shall provide temporary heating, covering, and enclosures as necessary and to the satisfaction of the Contracting Officer to protect all work and material against damage by dampness and cold, to dry out the buildings properly, and to facilitate completion of the work: \* \* \*."

The "general conditions" added the following article, among others, to the contract:

Article 24—*Access Roads* (Applicable to Part II only).

"Access roads to the project and on the site will be provided and maintained by others in such a manner as to permit this contractor to proceed with the work under this contract without undue interference or delay."

Certain of the before-mentioned "general conditions" were materially altered by "Addendum No. 2 To General Conditions for Prefabrication, Transportation, Construction and Erection, and Contract Form". Pertinent portions of Addendum No. 2 are set forth below.

"j. After the last words 'and all erection work' delete the 'period' and insert 'for a completed job, including the receiving, transporting, locating, installing and connecting, ready for use, all equipment in the numbers and at the locations as required by the contract documents'.

"k. Delete the following: 'in carload lots f. o. b. common carrier' and insert in place thereof 'in truckload lots at the individual building sites'.

"l. In the fourth and fifth lines delete 'The performance bond shall cover the Contractor's obligations under Parts I and II hereof' and in place thereof insert the following: 'The performance bond shall cover the Contractor's obligations under Part II hereof'.

\* \* \* \* \* \*

"7(a) The Contracting Officer will furnish four (4) stakes locating each house and indicate grade level for floor. The Contractor shall lay out all work within these four (4) stakes."

The remainder of the contract is drawn, for the most part, from United States Government Standard Contract Form No. 23.

The major portion of plaintiffs' claim is advanced as Count I of the petition and arises out of an alleged breach by the Government of Article 24 pertaining to access roads. Count II advances a smaller claim based upon an alleged arbitrary decision of defendant's contracting officer relating to the value of certain services rendered under a contract change order. Count III of the petition has been abandoned by plaintiffs.

### Count I

Considering first plaintiff's claim under Count I, the court must determine: (1) the proper interpretation of the contract entered into by the plaintiffs and the defendant; (2) whether or not defendant has breached that contract; (3) whether or not, if there was breach, the plaintiff was damaged thereby; (4) whether or not plaintiffs' acceptance of Change Order No. 36 operated to release their claim for damages based upon lack of access roads; (5) whether or not, assuming breach and damage thereby, plaintiff has presented to the court sufficient criteria by which damages may be computed and relief awarded.

The pertinent parts of the contract itself are set forth in the court's findings of fact. The more important provisions for the purpose of this opinion have been re-

peated above. Both parties took the position before the Commissioner and maintain here that the contract was not ambiguous, and the record and briefs of parties afford little aid in the interpretation of certain contract provisions which both parties claim to be clear—but which the parties interpret entirely differently. The contract clause about which the dispute centers is Article 24, which is, by the terms of the contract, applicable to Part II only and which provides "Access roads to the project and on the site will be provided and maintained by others in such a manner as to permit this Contractor to proceed with the work under this contract without undue interference or delay."

The contract for the fabrication and erection of the 500 dwelling units was entered into on April 2, 1942. The site had not at that time been designated with particularity, but plaintiffs knew that erection was to be in the vicinity of Texarkana, Texas. A later change order provided for the erection of 300 additional units, and the contract price was increased accordingly. The erection of that project was sublet, however, and is not in controversy here except with respect to certain plumbing changes considered under Count II.

Notice to proceed with the work under Parts I and II of the contract was issued by the defendant on April 29, 1942, and received by the plaintiffs on the following day. Immediately thereafter, the plaintiffs sought out the exact location of the project. They found that construction was to be at Hooks, Texas, about 14 miles from Texarkana. The project site consisted of a tract of 260 acres of flat and relatively level land, a portion of which had at one time been under cultivation, from which furrows remained, but which had then grown up in high weeds and brush. One-third of the site was covered with trees. A shallow creek ran an irregular course through the center of the tract. Its bed was dry except during the rainy seasons or during periods of heavy rainfall. There was a growth of briars, vines, brush, and small trees extending some 30 feet on each side of the creek. Although the land on both sides of the creek sloped gradually

to it, there were a number of depressions or low spots varying in size up to four acres where water collected after a rain. There were several small goose ponds, and, within the wooded areas, there were two large stock ponds. Each of these ponds held water for long periods of time. There were also a number of low mounds on parts of the site. In dry weather, the surface of the ground was dusty and hard with the exception of some areas of loose sand and although the cultivated portion was very rough, heavy trucks and similar equipment could be driven upon the open areas of the project. There was no natural drainage for a large part of the project. During wet weather and for a considerable time after heavy rainfall, the soil was wet and boggy. At such times it was impossible to operate large, heavily loaded trucks and difficult to drive lighter trucks and wagons anywhere on the site. About 900 feet of the southwest corner of the site fronted a concrete highway 18 feet in width separated from the site itself by a graded drainage ditch about two or three feet deep. A gravel road ran parallel to the east side of the project and intersected the concrete highway at a point beyond the site. There were no other surfaced or graded roads on or near the site. There was a railroad siding located across the paved highway at a point about three blocks from the southwest corner of the project.

It had been the intention of the Government's contracting officer that the site contract, which would involve preparation of building sites, grading of roads, and grading for drainage, would be let simultaneously with the fabrication and erection contract and that the work would go forward together. The Government, however, was unsuccessful in obtaining a bidder for the site work at this time and, although in daily anticipation of getting work started upon the site, a contract for this work was not in fact made until November 1942, and actual site clearing work did not commence until November 17, 1942. On the day the proceed order issued, the land was in a raw condition, without any identifying marks.

The plaintiffs interpreted the contract they had signed as requiring the Government to provide a prepared site and access to the individual building sites before being called upon to perform their part of the bargain. Plaintiffs' bid price was based upon the orderly, systematic erection of dwelling units upon previously graded building sites. The contract required the defendant, through its architect-engineer to furnish four stakes showing the location of each house and indicating the grade level for the floor. Under plaintiffs' erection plan, work is begun by putting in foundations in accordance with the stakes furnished. The foundations are installed in alternating operations by carpenter and concrete crews, parts for complete house units are trucked directly to individual building sites, and when the foundations are complete, the floors are framed thereon. Wall, ceiling, and roof panels are then erected simultaneously to give a closed-in house. Thereafter, the house is finished in a succession of jobs by specialized crews of mechanics.

Immediately upon viewing the project site, plaintiffs protested what they considered the premature issuance of the proceed order, the site not having been prepared nor access roads provided. The contracting officer was at the time under considerable pressure from the military, who demanded that houses be made available for defense workers at nearby ordnance plants, and, while admitting the proceed order to have been premature, he declined to rescind it, but urged plaintiffs to go forward, promising that any claim for excess costs would be given consideration at the close of the work. It is evident that at this stage of the controversy both parties saw in the contract a promise by the Government that access roads would be provided for the contractor's benefit.

Plaintiffs began performance. The findings of fact particularize the difficulties encountered. Initially, plaintiffs were hampered by wartime procurement difficulties, lack of adequate priorities,[1] "freezes" of material, labor shortages, and restrictions on motor transport. At the site, there was some difficulty in getting the concrete work under way. A still greater obstacle was defendant's delay in furnishing grade lines and, later, in providing cleared building sites.

Although originally scheduled for September, 1942, completion, the work lagged "horribly behind schedule" and was not actually completed until late in June, 1943. Throughout the rainy winter months plaintiffs were unable to operate mechanized equipment of any size over the project site because of the lack of access roads or even drainage. A freeze on motor transport obliged plaintiffs to ship by rail to the project area and then transport to the site by truck. Until about August 15, 1942, plaintiffs, because of lack of material, were unable to fabricate and deliver to the project site complete house units. Such parts as were furnished could not be put to immediate use and so, beginning early in June, 1942, were stockpiled on the site. By the time plaintiffs were able to ship complete dwelling units, bad weather had set in and great difficulty was experienced in getting the units to the individual building sites. Stockpiling continued while efforts were made to get the units into place. Part of the panels for the houses contained sheet-rock, an interior finish material susceptible to damage by moisture. The plaintiffs' superintendents and crew, while good mechanics, were not capable of organizing and carrying through a project of this size under adversity. The stockpiles were negligently kept in many instances and material was not properly protected from the inclement weather, while poor arrangement of the stockpiled material added to an unavoidably high incidence of breakage due to handling.

From time to time plaintiffs reiterated their protest at having to proceed upon an unimproved site and complained of defendant's many delays in furnishing grade lines, cleared sites, etc. At the same time the defendant repeatedly called plaintiffs' atten-

1. Although plaintiffs allege that the defendant breached its contract by not making timely application for project priority ratings, plaintiffs maintain that no delay resulted therefrom and claim no damages based thereon.

tion to the lack of care being afforded stockpiled materials and protested regularly about damaged materials being incorporated into houses and about other deviations from specification.

In order to complete the project, plaintiffs were obliged to furnish a great quantity of extra material to replace defective panels. It was also necessary to use a crew of expert carpenters for the repair of panels still salvageable. Because the erection and finishing of the houses could not proceed in orderly sequence and because of the great difficulty in hauling materials over the 260 acre tract, the construction period was greatly prolonged and a great deal of excess labor and overhead costs were incurred.

## The Contract

Turning first to an examination of the contract itself, and especially to Article 24,[2] it is evident from a literal reading that two equally logical interpretations are possible. Plaintiffs contend the true meaning to be that whatever access roads as may be necessary to plaintiffs' delivery and erection of the dwellings without undue interference or delay will be furnished "by others." Defendant contends the meaning to be that access roads to the project and on the site will be put in "by others" in such a manner that their work on the roads will not interfere with nor delay plaintiffs' work on the houses. This latter interpretation involves, also, the assumption that "access roads" means access for the people who are to live in the houses and not access for the builders. We must, in the light of all available facts, choose between these possible, and opposed, constructions.

Two circumstances point toward plaintiffs' interpretation as the proper one. First, Section 8(c) of the contract (set forth in full, supra) provided, in substance, that when more than one contractor was to work in the same vicinity, the work should be coordinated by the contracting officer so that the various workmen would not interfere with each other's work. Article 24 was added as a part of the "general conditions." If Article 24 meant only that the access roads were to be put in without interfering or delaying the erection work, then it is entirely superfluous, because Article 8(c) covers essentially the same situation. It is not to be assumed that Article 24 was added for no purpose. Second, both parties, before the advent of litigation, interpreted the contract to obligate the Government to provide access roads for the builder, so that the house panels could be trucked directly to location and erected in orderly sequence. The contracting officer proceeded initially upon this theory when he urged plaintiffs to go ahead, promising to consider their claims for lack of access roads at the conclusion of the project. Later, the contracting officer's interpretation changed to that now taken by defendant; but his superior,[3] as late as December 13, 1945, took the official position that the contract called for the Government to provide access roads for the contractor's use. Plaintiffs' representatives raised the issue of access roads and advanced their interpretation of the contract immediately upon learning that they were expected to proceed with erection upon an unimproved site. Their interpretation met with acquiescence on the part of the Government's representatives at that time. The conclusion follows that the parties themselves, at the time of contracting, believed that the contract obligated the Government to provide access roads for the use of the contractor.

The interpretation of a contract by the parties to it before it becomes the subject of controversy is deemed by the courts to be of great, if not controlling, weight. Central Engineering & Construction Company v. United States, 59 F.Supp. 553, 103 Ct.Cl. 440, 465. The now apparent ambiguity of a literal reading must

---

2. "Article 24—*Access Roads* (Applicable to Part II only) Access roads to the project and on the site will be provided and maintained by others in such a manner as to permit this Contractor to proceed with the work under this contract without undue interference or delay."

3. Assistant Commissioner for Development and Reutilization, Federal Public Housing Authority, Washington, D. C.

give way to the contemporary construction of the parties themselves, *viz.* that the contract required the Government furnish access roads to and on the site for the benefit of the contractor and before the contractor should commence deliveries.

## Breach of Contract

■ There can be no doubt that the Government did not provide access roads and that the contract was thereby breached. Plaintiffs allege lack of site preparation as a further breach, contending that a contract such as this carried with it an implied obligation on the Government's part to prepare the site for the work to be done by the contractor. A great deal of force is taken from plaintiffs' argument by the fact that a change order was issued June 30, 1942, and accepted without reservation by plaintiffs under which plaintiffs agreed, pending the arrival of the site contractor, to do the necessary filling and grading underneath the houses as erection proceeded. This change order was extended from time to time, and plaintiffs were paid for this work as well as granted contract time extensions because of it. However, it does appear from the evidence that plaintiff was delayed five days in this operation due to defendant's failure to furnish required grade lines, without which plaintiffs could not dress the fills to proper grade for drainage. Defendant's promise to supply grade lines implies the promise to supply them when needed in the prosecution of the work, George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70, and it thus appears that there was a further breach of contract by defendant to this extent. Delay was also occasioned by defendant's

failure to furnish promptly drawings and specifications for certain plumbing changes, but most of this delay occurred concurrently with other delays. Altogether we conclude that plaintiff was delayed, by the Government's breaches of contract, 30 days in the performance of Part I and 65 days in performance of Part II.

## Damages

■ A more difficult question is whether damages of which this court may take cognizance flowed from these breaches. Plaintiffs have not sought reformation of the contract; under the theory adopted they must show actual damages resulting directly from a breach of the contract as written. Part I of the contract, as amended, required plaintiff to fabricate and deliver to the individual building sites all parts necessary to a complete dwelling unit. The Government was to pay for work under Part I when it accepted delivery at the individual building sites.[4] Part II of the contract, as amended, required plaintiffs to erect the units and required the Government to pay for erected units when accepted as ready for occupancy. Subsection 1(m) (2)[5] of the general conditions provides that Article 24 of the contract shall apply only to Part II. Article 24, by its own terms, provides that it is applicable only to Part II. This article contains the only reference to access roads to be found in the entire contract, yet when the typewritten addendum amended the general conditions so as to shift the obligation to deliver the units to individual building sites from Part II of the contract to Part I, there was no corresponding amendment of Article 24.[6] It is the Government's posi-

4. When it became obvious that delivery to individual building sites could not be made on schedule under Part I, the Government waived its right to require delivery to the individual sites before paying plaintiffs' under Part I, and made payments upon the basis of delivery to stockpiles on the project site. The Government was not obligated to do this, no consideration for the change passed, and no change order issued. The reason for the waiver seems to have been a feeling that the contractor should be given every possible assistance in view of his difficult position and in rec-

ognition that the Government was remiss in not furnishing adequate site preparation. There was no alteration of the contract and no exercise of the contracting officer's authority to make changes under Art. 3 of the contract.

5. Section 1 (m) (2). Articles 1b, 4, 8, 11, 13, 17, 19, 23, 24, and 27 shall apply only to Part II of the Contract.

6. Part I of the Contract, as amended by the General Conditions, covered fabrication and delivery of house panels in carload lots f. o. b. common carrier, while

tion that this was a divisible contract and that any breach of the access roads provision must have been a breach under Part II, from which it follows that plaintiffs were not damaged by the breach, since the lack of access roads interfered with plaintiff's performance under Part I (to which Article 24 did not apply) and not with their performance under Part II, which covered erection only—an operation in which access roads play a very minor role. By the terms of this contract, it is divisible into two parts—one for the fabrication and delivery of parts—the other for the erection of those parts into dwelling units. Yet these two parts were integrated and dependent one upon the other and were to be carried on practically simultaneously and by the same contractor. The only possible damage that could flow from a breach of Article 24, as the parties themselves regarded it, was that the contractor would be unable to truck in the prefabricated panels to the building sites. Whether we consider the contract here divisible or indivisible, it is apparent that Part I and Part II were made with reference to each other and that damage under one part could be expected to result from a breach under the other. Assuming that two separate contracts exist here, and one, made in contemplation of the other is breached, the defendant is liable for all the reasonably forseeable damages flowing from the breach, including damages under the other contract that were in the contemplation of the parties at the time of execution. Western Union Tel. Co. v. Hall, 124 U.S. 444, 456, 8 S.Ct. 577, 31 L.Ed. 479; Ed S. Michelson, Inc. v. Nebraska Tire & Rubber Co., 8 Cir., 63 F.2d 597, 601. The defendant here is liable for all of plaintiffs' damages directly attributable to the Government's breaches of contract.

## Change Order No. 36

■ The defendant also contends that plaintiffs' acceptance of Change Order No. 36, which extended the contract time and relieved plaintiff from liquidated damages, operated to release plaintiffs' claims for damages due to lack of access roads and negligent delays on the part of the Government. It has been repeatedly held by this Court that provisions for an extension of time for completion of the work on account of delays due to unforeseen causes, including those caused by the Government, do not serve to relieve the Government from liability. George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70, 97. The provisions of Change Order No. 36 that "All claims against the United States of America which are incidental to or as a consequence of the aforementioned change, including claims, if any, for adjustment of contract time, are satisfied" does not foreclose the plaintiff from a remedy for breaches of contract which in fact delayed and damaged it, because it is clear that the 266 day extension of contract time granted by Change Order No. 36 was neither offered nor accepted as a compromise of plaintiffs' then pending claims against the United States. Henry Ericsson Co. v. United States, 62 F.Supp. 312, 104 Ct. Cl. 397. On the date that Change Order No. 36 issued, plaintiffs had damage claims pending for over $200,000, and if it had been the parties intention to compromise this claim, it is evident that such intent would have been recited in the change order. That the parties did not consider this claim compromised is apparent from the fact that final settlement was made expressly reserving plaintiffs' right to press this very claim.

## Measure of Damages

We come, then, to the problem of determining the amount of damages, to which plaintiff is entitled because of the interference and delay occasioned by defendant's breach of contract. As a result of defendant's breach, plaintiffs were forced to depart drastically from their usual orderly procedure and to work haphazardly about the project as building sites became avail-

Part II covered transportation costs from that point and erection at site. The Addendum to General Conditions further amended the Contract so that Part I in-

cluded delivery of the panels in truckload lots at the individual building sites, while Part II was to cover the erection work only.

able and accessible. Building parts were stockpiled instead of being delivered directly to building sites. House panels were handled and rehandled before they were finally incorporated into houses, and each handling took its toll in breakage. The project ran on into the winter months and damage to stockpiled materials from winter rains was severe. At the same time, it is apparent that another cause of stockpiling rather than delivery direct to sites was that plaintiffs were not able, at least until the middle of August, 1942, to deliver complete house units due to shortages of certain components and to the wartime "freeze" on motor transport. Complete carloads of certain types of panels would be shipped by rail and stockpiled awaiting the arrival of other panels necessary to the erection of a complete unit. The stockpiling was inefficiently handled and inadequate steps were taken to protect the stored panels until late in October 1942.

The end result was that plaintiffs, in order to complete performance under the contract, were obliged to ship some $41,447.36 worth of excess material[7] to the project and to expend $92,690.28 for excess labor,[8] to which must be added $8,418.71, representing payroll taxes and insurance upon the foregoing. The contract lagged 280 days behind schedule, and a portion of plaintiffs' overhead expenses during this period was properly chargeable to the Hooks project. Grand Trunk Western R. Co. v. H. W. Nelson Co., 6 Cir., 116 F.2d 823; M. H. McClosky, Jr., Inc., v. United States, 66 Ct.Cl. 105. Team hire caused an extraordinary expense of $1,507.50, and about $2,000.00 in excess of normal requirements had to be expended for truck hire.

## Overhead, Part I

Although there were at many times concurrent delays, it is found that the Government, in breach of its contract, caused plaintiff 30 days' delay in performance of Part I of the contract. During this time, plaintiffs' overhead, of which $319.83 per day may be considered applicable to the instant contract,[9] was prolonged. Plaintiff is entitled to recover $9,594.90 on this account.

## Overhead, Part II

Sixty-five days' delay to plaintiffs' performance of Part II is solely attributable to the Government and in breach of contract. The plaintiffs' daily overhead attributable to this part of the contract was $77.95.[10] Plaintiff is entitled to recover $5,066.75 on this account.

## Team Hire

Plaintiffs' claim for team hire in the amount of $1,507.50 is directly attributable to lack of access roads. Had the defendant not breached its contract in this respect, the plaintiff would not have had to use teams at all. Plaintiff is entitled to recover $1,507.50 on this account.

## Truck Hire

Plaintiffs were required, because of defendant's failure to provide access roads on the project site, to expend $2,000 in excess truck hire and are entitled to recover that sum on this account.

7. "Excess material" meaning material required beyond that actually required to be incorporated into finished units plus allowance for normal breakage and material defects when operating upon a prepared site.

8. "Excess labor" meaning labor required in excess of what would have been required had plaintiffs been able to proceed upon a prepared site, making truck deliveries of complete units to building sites and without stockpiling.

9. Total overhead of Houston Ready-Cut House Company (which performed Part I) was determined. The ratio between this amount and the company's total sales for the same period was determined. That ratio was applied to the amount of sales involved in the performance of Part I of the contract to determine that overhead applicable to performance of Part I. Average daily overhead was arrived at by dividing this figure by the number of days required to perform the contract.

10. Liberty Builders, Inc., performed Part II of the contract, and their average daily overhead allocable to the Hooks project was computed by the method outlined in footnote 9 to which was added the salary of Liberty Builder's job superintendent as a field overhead expense item.

### Excess Material and Excess Labor

As a measure of damages for excess material and labor claims, plaintiffs have offered a comparison between unit costs of a similar project at Mineral Wells, Texas, where access roads were furnished, and unit costs at the instant Hooks project. Such a comparison cannot be expected to yield perfect accuracy, but "absolute certainty as to the amount of the damages is not essential, this being a matter for determination according to the circumstances of each case. All that the law requires is that such damages be allowed as, in the judgment of fair men resulted from the breach of contract for which suit is brought." Needles v. United States, 101 Ct.Cl. 535. In arriving at our determination as to the amount of damages suffered by plaintiff because of defendant's breach of contract, we have considered the proofs laid before us by both plaintiff and defendant. We have examined the comparison between the unit costs as Mineral Wells and those at Hooks and have made allowance for acknowledged variables between the two projects. We have considered the various causes of excess cost and the fact that neither party was at all times faultless. Upon all the evidence before us, we find that excess material costs attributable to defendant's breach of contract amount to $19,220.00 and that excess labor costs attributable to defendant's breach of contract amount to $42,904.00. Payroll taxes and insurance paid on the above excess labor charges are found to be $3,844.00.

### Count II

Under Count II of the petition, plaintiffs claim the sum of $4,176.00 as additional compensation due for work performed and material furnished by them in connection with the change involving the substitution of showers for bathtubs in dwelling units. The original specifications called for the installation of bathtubs in each of 800 units. It was later decided to substitute shower stalls, and the Government directed plaintiffs to submit a proposal for the cost of the extra work. A sample installation was made before the Government's representatives at the project, and an itemized proposal totaling $18.50 was submitted by plaintiffs and approved by the two Government representatives at the site, the project manager and project engineer. The contracting officer, however, objected to approving extra compensation of more than $15.00 per unit. Subsequently, plaintiffs found that they had omitted certain items from their estimate, and submitted a supplemental proposal increasing the price per unit by $1.72. The contracting officer executed the change order in the amount of $15.00 only, giving his reasons therefor in a letter dated April 9, 1946. This decision was appealed from and affirmed by the head of the department on April 19, 1946. It is plaintiffs' contention that the contracting officer's decision was arbitrary and capricious and should be set aside in favor of a finding that the reasonable value of the change was $20.01 per dwelling, or $4,008 more than the sum allowed and paid by defendant. It is clear that under the contract considered here, the contracting officer's decision, if supported by findings of fact, is final unless arbitrary or capricious. United States v. Callahan Walker Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49. Cf. Wunderlich v. United States, C. Cls. No. 46307, Decided June 5, 1950, 117 Ct.Cl. ——.

The major item of disagreement between plaintiffs' proposal and defendant's allowance regarded the amount of time to be credited the Government on the shower substitution. The original specifications called for setting bathtubs, and the contractor's estimate was based upon the time of a plumber and a helper. Less time is required to set a shower than a tub, and in estimating the cost of the change, the Government was to be credited with the time saved by the installation of the shower in lieu of the tub. The contractor allowed one hour's credit; the contracting officer first demanded that three hours time be allowed, then compromised and allowed two hours, the difference amounting to $2.25. The evidence shows that the problem was considered by the contracting officer and that the decision was reached upon the basis of previous experience with similar

changes. Under these circumstances, we cannot hold that such a considered finding was arbitrary.

■ The second item disallowed was the subcontractor's overhead of 15% and profit at 10% on the work. The contracting officer allowed 15% for both asserting only the conclusion that this was "reasonable." The plaintiff complains that it was arbitrary. Article 36b(3) of the contract applies to changes of this type and provides that "the cost may include an allowance for overhead and profit not to exceed 15% of the net cost." The contracting officer's decision can hardly be held to be arbitrary in this respect, as a more liberal decision would have been beyond his authority.

■ The third item disallowed was plaintiff's supplemental request for $1.72 per unit for items inadvertently omitted from the original estimate. The contracting officer ruled that the "late submittal * * * did not convince the contracting officer that the actual value of the work * * * was over $15.00 per unit." There is no indication here that the contracting officer gave more than passing notice to this supplemental estimate. No findings were made that the extra material included by the contractor was not needed or that the price was out of line. The contracting officer merely stated that he was not convinced—no other reason was given for the decision. Such an unsupported decision and evidence of lack of willingness to consider a claim upon its merits is not a ruling or decision entitled to finality under Article XV of the contract and must be set aside. We hold that the bid price of $1.72 per unit for the supplemental materials was reasonable and that plaintiff is entitled to recover this sum for each of the 800 units in which the change was effected—a total of $1,376.00.

Defendant's contention that plaintiffs' claim under this count is barred because of failure to appeal in time from the contracting officer's decision is without merit, because the contracting officer did not, until April 9, 1946, make a formal denial of plaintiff's claim based upon written findings of fact. Before this decision plaintiff had nothing to appeal from and, indeed, carried the case to the head of the department before a formal decision was ever made by the contracting officer.

Count III of the petition has been abandoned.

■ Plaintiffs have admitted defendant's counterclaim in the sum of $666.40. Interest on this amount from the date the indebtedness arose through overpayment by the Government of bond premium cost cannot be allowed. Standard Steel Car Co. v. United States, 67 Ct.Cl. 445.

Through administrative decisions, plaintiffs have already received $15,381.94 upon the claim set forth in Count I, and this amount has been credited against the judgment entered herein.

■ Judgment will be entered for plaintiff for $70,131.21, less $666.40 (the amount of defendant's counterclaim). It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.