Davis, Judge,
delivered tbe opinion of the court:
This suit seeks $33,731.42 because of the termination by the defendant, for its own convenience, of a contract for the production of photoflash cartridges. Plaintiff, a St. Louis-based company, had a series of three agreements (Contracts 744, 850, 866) with the St. Louis Ordnance District of the Department of the Army to manufacture various types of these items. The only one of the contracts involved here is No. 866, entered into on June 30, 1954. It contained a standard termination-for-convenience article, obligating the defendant to pay, on such termination, for all completed supplies accepted by the Government and also for other costs incurred in the performance of the work terminated.
Because of the plaintiff’s difficulties with, and the consequent changes in, the prototype cartridge contract — No. 744, entered into a year earlier — the Government did not wish to incur costs under the new supplemental contract, No. 866, until it was sure that the items, as they might be changed in the course of performing the initial contract, could in fact be produced. Satisfactory cartridges had not yet been made under Contract 744. During the negotiations for Contract 866, plaintiff met this obstacle by writing to the defendant that it was “agreeable to a clause providing that no cost will be incurred against the pending contract [No. 866] without the prior approval of the Contracting Officer until this contract be released for production.” The Government’s notice of award referred to this letter as part of the company’s proposal which the Government accepted, and Article VIII of the formal contract provided that the contractor was not to incur any costs in preparation for production under this contract without prior written approval of the contracting officer.
Simultaneously with the negotiation of Contract 866, the parties were also considering another supplemental cartridge contract, No. 850 — not involved in the present case — which contained an identical provision for prior written approval of costs, designed to deal with the same uncertainty as to the *420 feasibility of making the end-item. This Contract 850 was wholly released for production in March 1955.
The production problems under the basic Contract 744 continued until the early part of 1956, when these difficulties were solved and the parties then began to consider production and delivery under Contract 866. Informal oral discussions led to a letter from plaintiff to the Ordnance District, dated May 22, 1956, in which the contractor requested “release of Contract 866 for material procurement and production.” The letter pointed out that there would be an interruption in schedule between Contract 744 and Contract 866 unless the latter “can be released shortly”; it was also said that aluminum prices had increased several times since the original contract date but that if Contract 866 were immediately released the plaintiff would be able to produce the cartridges at no extra cost.
In response, the contracting officer’s letter of June 27, 1956, authorized plaintiff to procure materials necessary for production of the cartridges covered by Contract 866 but also specifically said that “acquisition of materials shall be limited to the raw materials necessary for production of the cartridge in accordance with the change orders” applicable to this item in Contract 744 (which changes were to be incorporated in Contract 866) (emphasis added). The contracting officer deliberately restricted his release to raw materials in order to meet plaintiff’s complaint about the rising price of aluminum, but the company’s representative has testified that he did not notice the word “raw” in the letter.[1]
The Government terminated Contract 866, for its own convenience, on October 4, 1956. No deliveries had been made under it, and none of the contract items had been completed. Plaintiff’s settlement proposal, as revised, consisted of claims for (a) a large number of electric primers, finished components destined for incorporation in the end-item, and *421 (b) dies and other tooling for manufacturing the end-item. These claims were denied by the contracting officer on the ground that the primers and the tooling were not “raw materials”, which alone had been released for acquisition by the plaintiff. The Board of Contract Appeals affirmed on the same ground.
Plaintiff no longer contends that the primers and the tooling were “raw materials.” [2] The argument in this court is, first, that the parties agreed, when they negotiated Contract 866, that the contract when released for production would be released in toto; and, second, that the defendant’s letter of June 27, 1956, necessarily amounted to such a total release, despite its wording. We cannot adopt either of these propositions.[3]
First, we think it clear that the parties did not agree that Contract 866 would have to be released, for every purpose, all at one time. In the simultaneous negotiations for companion Contract 850 plaintiff did indicate that it objected to piecemeal release of the contract for production and desired a single release in toto. But the letter it wrote (on June 18, 1954) embodying that specific condition (see finding 8) was confined to Contract 850', and the nearly contemporaneous letter (of June 25, 1954) accepting the Government’s release requirement for Contract 866 (involved here) failed to include or refer to any such limitation. Be that as it may, the conduct of the parties affirmatively discloses that they distinguished between a release of an end-item for production (whether the release be single or multiple) and the incurring of costs prior and preparatory to the production-release. Plaintiff’s basic letter of June 25, 1954, on Contract 866 — which was incorporated in the award— states that ho cost will be incurred without the prior approval of the contracting officer “imtil this contract be released for production” (emphasis added). This envisages the incurring of costs, with Government approval, before a release for production. The formal contracts for both *422 Contract 866 and Contract 850 declared (in Article VIII) that the contractor had to have approval for incurring any costs “in preparation for production under the contract.” This, too, assumes that there can be expenditures prior to production. When Contract 850 was released for production in March 1955 (over a year before the defendant’s letter of June 27, 1956, on Contract 866), the contracting officer expressly wrote that the company was “authorized to incur costs in preparation for production” and also that the contract was released for production. When plaintiff came to seek the go-ahead signal on Contract 866, in May 1956, it likewise separated procurement of materials from a release for production, asking for “release of Contract 866 for material procurement and production” (emphasis added). The defendant answered, in its letter of June 27th, by releasing the contract for the procurement of raw materials only. In the light of this contractual history, it seems plain that the parties contemplated that Contract 866 could be released for the purchase of the necessary materials, all or in part, before it was released for actual production of the end-item.[4]
What the parties thus anticipated as within their agreement did come to pass. The contracting officer’s letter of June 27, 1956, authorizing plaintiff to procure only raw materials for Contract 866, accorded with this aspect of the agreement; it did not amount to a release of the contract for production itself. Nothing in the letter suggests the total release plaintiff claims. Unlike the earlier communication on Contract 850, there was no reference to a release for production. Moreover, this authorization to purchase raw materials was wholly consistent with the contracting officer’s understanding that plaintiff was particularly disturbed about the rising price of aluminum because it proposed to change its prior practice so as to have a subsidiary manufacture the cartridge cases for Contract 866 from raw aluminum (see finding 17). It must have been thought that the limited authorization would adequately protect plaintiff *423 until the contract was released for production. Concomitantly, the defendant would be saved from having to pay undue termination costs if the contract should happen to be terminated at an early state.
Plaintiff argues that, nevertheless, the parties actually viewed the release as one for full production. It does not, of course, rely on its negligent failure to notice the adjective in the phrase “raw materials”, hut it points to its letter of July 27, 1956 (see footnote 1, supra) referring in passing to the defendant’s June 27th letter as “releasing this item for production.” Defendant is obviously not bound by a casual self-serving statement of this type. Plaintiff also stresses that on August 1, 1956, both parties joined in a supplementary agreement providing a new delivery schedule for the cartridges; it would have been “suicide”, plaintiff says, for it to have agreed to a new fixed delivery schedule if the contract had not yet been released for production. Defendant’s reply is persuasive. The first deliveries under the new schedule were not to be until March 1957, some seven months after the supplement of August 1, 1956; the contract required little lead-time and could handily be released for production much closer to March 1957. In addition, plaintiff’s argument is deprived of substance by the fact that Contract 866, as originally made on June 30,1954, contained a delivery schedule beginning in October 1954 — at the very same time that the parties’ agreement forbade plaintiff to begin production until released by the Government. The original delivery schedule was obviously expected to be inoperative if the contract was not released for production sufficiently in advance; in August 1956 the parties were simply updating the potential schedule to take account of the lapse of two years. This supplementary agreement, in short, does not support plaintiff’s view of the breadth of the release given on June 27th.
We see no reason, therefore, why the defendant’s letter should be taken as other than what it purports to be — an authorization to purchase raw materials only. Those were the only items plaintiff was permitted to procure prior to the termination of Contract 866. Since the administrative termination claim, as well as the claim in this court, includes *424 no raw materials, plaintiff cannot recover. No costs were properly incurred under tbe contract, and the United States is not 'liable under the termination clause for costs improperly incurred.
The petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Eoald A. Hogenson, and the briefs and arguments of counsel, makes findings of fact as follows:
X. Plaintiff is and was a Delaware corporation with principal office in St. Louis, Missouri.
2. As of June 26, 1953, plaintiff and defendant, the latter acting through the St. Louis Ordnance District of the Department of the Army, hereinafter called the District, entered into Contract No. DA-23-072-ORD-744, hereinafter called Contract 744, for the production of M123 Photo-flash Cartridges, 2-, 4- and 6-second delay, and M112 Photoflash Cartridges, 1- and 2-second delay.
Under Contract 744, plaintiff encountered considerable difficulty in attempting to produce the contract items, including the M123’s with 2-second delay and the M112’s. Numerous changes in specifications were made under Contract 744 to achieve production of the desired items. As late as May 4, 1954, the difficulties had not been solved, and the parties had some doubt that they would be.
3. On May 4, 1954, the District issued its Request for Proposal No. 772-N for the furnishing of an additional 120,000 of the M123 Photoflash Cartridges with 2-second delay. Despite the difficulties encountered under Contract 744, plaintiff submitted on May 14, 1954, its proposal on these additional items.
As of June 30,1954, after negotiations between the parties, plaintiff and defendant, acting through the District, entered into Contract No. DA-23-072-ORD-866, hereinafter called Contract 866, the contract in suit, for production of the additional M123 cartridges.
4. At the same time that the District sought proposals for the additional M123 cartridges, it also sought proposals for additional M112 cartridges. Plaintiff submitted a proposal *425 and was later awarded Contract DA-23-072-OED-850, hereinafter called Contract 850.
5. The District’s pertinent Eequest for Proposal, which resulted in Contract 866, stated that any contract negotiated would include an appropriate “Termination for Convenience of the Government” clause as authorized by Armed Services Procurement Eegulations, and Contract 866 did contain such a clause which provided that in the event of such a termination of the contract, the contractor would be paid, among other things, for “completed supplies accepted by the Government” 'and the “costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but exclusive of any costs attributable to supplies paid or to be paid for” under the provision concerning completed supplies accepted by the Government.
6. During the negotiations between the parties, leading to the execution of Contract 866, conferences were held in which it was stated that because of the difficulties under the existing Contract 744, the Government was concerned about costs that might be incurred under the proposed Contract 866; that in the event materials were purchased or labor performed, the materials and components might become obsolete by way of changes ordered, or otherwise unusable should production difficulties not be solved; and that it was desirable from the Government’s standpoint that no costs be incurred under the proposed 'Contract 866 until it was known that the items, as they might be changed, could in fact be produced.
7. Negotiations between the parties concerning proposed Contract 850 were conducted at the same sessions as those pertaining to proposed Contract 866, with the problems related hi finding 6 applicable to both proposals.
8. By letter dated June 18, 1954, plaintiff made subject reference only to the District’s proposed procurement of M112 Photoflash Cartridges, the subject of proposed Contract 8'50, and advised the District as follows:
Eeference is made to your call on June 18th. You have expressed that in view of the production difficulties in the production of Contract DA 23-072-OED-744, it is the feeling of the Board that no initial commitment should be made by Contractor without the Contracting Officer’s approval.
*426 We are willing to accept such condition as follows:
This is not to be understood that each individual commitment requires Contracting Officer’s approval. Once the item is released for production by Contracting Officer, no other restriction than set out in our proposal shall prevail.
We also wish it to be understood that all time lost waiting for this subject approval be added to the delivery schedules if needed by Contractor.
9. By letter to the District dated June 25, 1954, plaintiff made subject reference only to the District’s proposed procurement of M123 Photoflash Cartridges, 2-second delay, the subject of proposed Contract 866, and stated it would accept the proposed contract with the following condition, among others, to be included:
(c) The Company is agreeable to a clause providing that no cost will be incurred against the pending contract without the prior approval of the Contracting Officer until this contract be released for production.
10. Plaintiff was awarded Contract 866 by notice of award dated June 30,1954, stating in part as follows:
The United 'States of America, acting through the undersigned Contracting Officer, hereby accepts your company’s offer on the terms stated in your proposal of 14 'May 1954 as amended by letters of 26 May 1954, 11 June 1954 and 25 June 1954 to furnish and deliver the following articles at the prices indicated :
* * * * *
As stated in your proposal, your offer is accepted with the understanding that the agreement between your company and the United States of America shall be embodied within a reasonable time after the date of this letter in a single instrument, * * *.
11. Contract 866 provided for delivery of 50,000 M123 Photoflash Cartridges, 2-second delay, in October 1954, 50,000 in November 1954, and 20,000 in December 1954, with a 2-month acceleration of such deliveries permitted, and contained, among others, the following provisions:
whereas, the Government by Notice of Award, dated 30 June 1954, accepted the Contractor’s proposal of 14 May 1954, as amended by letters of 26 May 1954,11 Juno 1954, and 25 June 1954, to furnish and deliver to the *427 Government 120,000 each, Cartridge, Photoflash, M123, 2 Second Delay, at the rate of $4.6741 each for a total price of $560,892.00; and
# Hí ‡ ❖ #
article vni. The Contractor shall not incur any costs in preparation for production under the Contract without prior written approval of the Contracting Officer, provided, however, that the Contractor shall not be considered delinquent nor in default because of delays occasioned by: (i) the Contracting Officer in not expeditiously approving Contractor’s request to expend funds (ii) a lack or absence of testing material or equipment or reports on the part of any Government agency (iii) a subsequent determination of the fact that acceptable end items cannot be produced in accordance with the existing Bases of Procurement.
The above-quoted Article YIII was also included in Contract 850.
Contract 866 contained the standard Disputes article.
12. By letter dated March 24,1955, from defendant’s contracting officer to plaintiff, Contract 850 was released for production, as follows:
In accordance with the provisions of Article VIII of Contract No. DA-23-072-OBD-850, the Universal Match Corporation is hereby authorized to incur costs in preparation for production. This letter is also to be construed as a release for production under the contract.
13. After the execution of Contract 866, plaintiff continued its efforts to perform Contract 744 through the balance of 1954, throughout 1955, and into 1956. Changes in the specifications for the M123 cartridges, 2-second delay, were made under Contract 744 and also under Contract 866. Change Orders 1 through 7 under Contract 866 were issued in 1955 on January 7 and 26, February 8, and December 28; and in 1956 on January 25, and February 6, and 17.
14. Sometime during the first four months of 1956, the production difficulties under Contract 744 were resolved, and deliveries of M123 cartridges, 2-second delay commenced thereunder. Discussions then ensued between the parties concerning production and deliveries of this item under Contract 866.
15. By letter to the District, dated May 22,1956, plaintiff *428 made reference to a telephone conversation between plaintiff’s principal officer and the District’s contract administrator, and stated as follows:
With reference to the above telephone conversation and to several discussions preceding this call, request is hereby made for release of Contract 866 for material procurement and production.
With the anticipated production according to the existing schedule on Contract 744, we are about at the point where the lead-time necessary for dies and subcontracted parts will shortly be used up. An interruption in schedule between Contract 744 and Contract 866 will occur unless Contract 866 can be released shortly.
We also want to point out that since the original contract date aluminum prices have been increased several times. However, we feel that if immediate release of Contract 866 can be obtained, we will be able to produce the item at no increase in cost.
With this requested release we also suggest that all engineering changes and cost changes which have gone into Contract 744 and are applicable to Contract 866 be included in the referenced contract at the earliest convenience.
16. By letter dated June 27,1956, defendant’s contracting officer advised plaintiff as follows:
You are hereby authorized to procure materials necessary for production of the Photoflash Cartridge, M123, 2-Second Delay covered by Contract DA-23-072-OBD-866.
Acquisition of materials shall be limited to the raw materials necessary for production of the cartridge in accordance with the change orders applicable to this round in Contract DA-23-072-ORD-744 and which will be incorporated in Contract DA-23-072-ORD-866.
17. Plaintiff had purchased cartridge cases from subcontractors under Contract 744. Its proposal leading to Contract 866 showed it intended to continue this practice. However, plaintiff was considering the possibility of having its wholly-owned subsidiary, Impax Incorporated, purchase and extrude aluminum and manufacture such cases under Contract 866. Plaintiff had so advised the District’s engineers assigned to plaintiff’s contract performance, and this information had been relayed to defendant’s contract ad *429 ministrator and its contracting officer prior to the sending of the letters quoted in findings 15 and 16. In connection with discussions concerning revision of delivery schedules under Contract 866, plaintiff’s negotiator had stated to defendant’s contract administrator that plaintiff could not agree to deferment of deliveries without a price increase unless it had a release to purchase aluminum in the current market. Because of these circumstances, the terms “raw materials necessary for production of the cartridge” were deliberately used by the defendant’s contracting officer in his letter quoted in finding 16. Plaintiff’s negotiator testified that he did not notice the word “raw” in the letter.
18. By Change Orders 9 and 10, dated respectively June 29 and July 27, 1956, further changes in specifications were made under Contract 866, and defendant thereby required plaintiff to notify defendant’s contracting officer in writing within 10 days as to what point in production the pertinent Changes would be incorporated.
Defendant had by letters dated June 18 and 20, 1956, advised plaintiff that consideration was being given to incorporating in Contract 866 various other specification changes that had been applied to Contract 744, and requested plaintiff to determine what effect they would 'have on the production schedule and to furnish a cost breakdown if either a cost increase or reduction would result. Each letter stated that it was not to be regarded as authority to proceed with fabrication.
By letter to the District dated July 27, 1956, plaintiff replied to the letters of June 18 and 20, 1956, made reference to “your letter of June 27, 1956, releasing this item for production,” and enclosed cost increase breakdowns, stated to reflect all new costs of materials, labor, and overhead necessitated by the change orders and the passage of two years since the signing of the contract.
19. After considerable negotiations between the parties, plaintiff and defendant on August 1,1956, executed Supplemental Agreement No. 8 to Contract 866, by which the delivery schedule was amended to provide delivery of 35,000 of the contract items on or before March 31, 1957; 35,000 on or before April 30, 1957; 35,000 on or before May 31, 1957; *430 and 15,000 on or before June SO, 1957. It was further provided that the stated quantities were “the minimum requirements for each month and the Contractor has the right to accelerate deliveries at any time.”
20. By Change Orders 11 and 12, dated respectively August 7 and 21, 1956, further changes in the Contract 866 specifications were made.
21. On October 4, 1956, Contract 866 was terminated by defendant for the convenience of the Government. No deliveries had been made under the contract. None of the contract items had been completed. The termination covered all items.
22. On November 20, 1956, plaintiff filed its termination settlement proposal under Contract 866 with the District, requesting payment of $40,707.93, consisting of the following items:
Direct material-$26,662.03
Other costs- 10, 365.18
Profit_ 3,700.72
Total_ 40,707.93
The direct material was stated to consist of 122,257 primers, electric, M59, at $0,218 each for a total of $26,652.03. The other costs were claimed to be “incomplete cartridge case and cartridge dies” in the amount of $10,355.18. The claimed profit was 10 percent of the total of the direct material and other costs.
23.Defendant conducted an audit of plaintiff’s termination settlement proposal, and on April 1, 1957, an advisory audit report was filed with defendant’s contracting officer.
This audit report showed that the quantity of primers, stated to be 122,257 in plaintiff’s claim, was based upon plaintiff’s inventory of such primers as of October 31, 1956, less the number of primers necessary to complete production under Contract 744 as of that date. Plaintiff’s production records disclosed that such excess inventory amounted only to 93,164 primers. These primers were finished components and bat for the termination would have been incorporated in the end items of Contract 866. Based upon the decrease of 29,093 in the quantity of primers at the claimed cost of *431 $0,218 each, and a corresponding adjustment of the claimed profit item, the audit report recommended disallowance of $6,976.51 of plaintiff’s claim for $40,707.93, leaving a balance of $33,731.42 for further consideration. Plaintiff concurred in, this reduction of its claim by $6,976.51 in the audit discussions.
Defendant’s audit verified plaintiff’s costs on the balance of its claim in the sum of $33,731.42, taking into consideration all expenses, including direct material, labor, supervision and other direct costs, overhead, general and administrative expense and an overall profit allowance of 10 percent.
24. The defendant’s audit report submitted to the contracting officer the question of the allowability of plaintiff’s claim as reduced to $33,731.42 (a) as to whether such overall expenses were authorized by the contracting officer’s letter of June 27, 1956, quoted in finding 16, and (b) as to whether direct material and tooling expenses incurred prior to June 27,1956, were allowable.
All of the purchase of materials for manufacture of the pertinent primers occurred prior to June 27, 1956, in the period of time from October 1953 through April 1956. The unit cost for materials in the primers was $0.12 which, for 93,164 primers, would amount to $11,179.68.
Of the total sum of $3,105.57 expended under Contract 866 for tooling, $1,130.59 was spent prior to June 27, 1956, and $1,974.98 thereafter.
25. Neither the primers nor the tooling forming the basis for plaintiff’s termination claim were raw materials for performance of Contract 866.
26. Plaintiff’s termination claim in the amount of $40,707.93 was denied by decision of defendant’s contracting officer on May 10, 1957, on the ground that the claim pertained “only to finished components (primers) and tooling and not raw materials and was thus unallowable.”
27. By letter to the District dated June 7, 1957, plaintiff revised its claim downward to $16,609.99, comprising only material costs, by eliminating “all items which might be connected with preparatory or production work which we were not authorized to perform.”
*432 This revised claim was denied by decision of defendant’s contracting officer on July 15, 1957, reaffirming his findings made in his decision of May 10, 1957, and stating that the primer components and tooling included in the revised claim were not properly allocable to termination costs.
28. Upon appeal, the Armed Services Board of Contract Appeals (Army Panel, Appeal No. 4554) by decision dated March 25, 1959, denied plaintiff’s claim on the grounds that Contract 866 was not released for production, that the defendant’s contracting officer by his letter of June 27, 1956, authorized procurement only of raw materials for the cartridge, and that plaintiff was authorized to incur costs only for raw materials necessary for production of the cartridge. The board reasonably found on the basis of the testimony and evidence before it that neither the primers nor the tooling were raw materials.
Except for the letter quoted in finding 12, the only evidence presented in the trial of this case before this court was the record of proceedings before the Armed Services Board of Contract Appeals.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Thereafter, defendant issued various change orders modifying the specifications under Contract 866. Earlier, it had requested comment from plaintiff on other proposed changes (warning that the request was not to be regarded as authority to proceed with fabrication) ; the plaintiff’s reply of July 27, 1956, to these requests for comments referred to the defendant’s letter of June 27, 1956, as “releasing this item for production.” A supplemental agreement, changing delivery dates and quantities, was entered into on August 1,1956.

 It could hardly do so In view of the adverse findings of the Board of Contract Appeals and of our Trial Commissioner.

 These issues are legal questions for us to determine independently of the administrative determination. See W. S. Edwards Engineering Corp. v. United States, decided this day, ante, p. 322.

 The conduct of the parties under a contract plays an important role in interpreting it. Union Paving Co. v. United States, 126 Ct. Cl. 478, 489, 115 F. Supp. 179, 185 (1953) ; Chahroudi v. United States, 124 Ct. Cl. 792, 797-98 (1953) ; Houston Beady-Cut House Co. v. United States, 119 Ct. Cl. 120, 187-88, 96 F. Supp. 629, 635-36 (1951) ; Central Engineering and Construction Co. v. United States, 103 Ct. Cl. 440, 465, 59 F. Supp. 553, 565 (1945).